359 So.2d 1190 (1978)
Carl JACKSON, Appellant,
v.
STATE of Florida, Appellee.
No. 48165.
Supreme Court of Florida.
March 9, 1978.
Rehearing Denied July 13, 1978.
*1191 Louis G. Carres, Asst. Public Defender, Tallahassee, for appellant.
Robert L. Shevin, Atty. Gen., and Richard W. Prospect, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Appellant, Carl Jackson, was convicted on two counts of murder in the first degree.[1] The jury recommended and the trial judge imposed a sentence of death. Jurisdiction vests in this court pursuant to Article V, Section 3(b)(1), Florida Constitution. We affirm the conviction and sentence.
On Sunday morning, April 20, 1975, Ann Patterson Butler was found shot in the head behind the counter of the Jr. Food Store in Bay County, Florida. A short time later, the corpse of Mary Frances Price was found in the front seat of a Chrysler automobile parked in a cemetery a short distance away. There were no witnesses to the actual killings. The following facts were adduced at trial:
On the morning of April 20, 1975, Jimmy Harris, an acquaintance of Jackson's, stopped by appellant's apartment to collect a debt. Appellant asked Harris to drive him to a friend's house to pick up the money. Instead of directing Harris to the other person's house, however, Jackson, with a gun in his belt, told Harris to stop at a Jr. Food Store. He then got out of the car and ordered Harris to drive around the block, return, and pick him up. Harris drove away but did not return. Later that day, after hearing that the Jr. Food Store had been robbed, Harris went to the police and related the above information concerning appellant's earlier activities.
That same morning, Mr. and Mrs. Price stopped at the Jr. Food Store on their way to church. Mrs. Price waited in the car while Mr. Price went into the store. The keys to the car remained in the ignition. When Mr. Price entered the store, he turned left, away from the counter, and walked to the far corner of the building. After finding the item he wished to purchase, he approached the counter where he found Mrs. Butler, the sales clerk, lying on the floor in a pool of blood. He immediately telephoned the police and then looked out the front door and discovered that his wife and his car were missing. Both were found in a cemetery a few blocks away from the Jr. Food Store. Mrs. Price had been shot in the head at close range.
During the course of the investigation, appellant's jacket was discovered in the woods a few feet from the abandoned car. *1192 His girlfriend testified that he was wearing the jacket when he left their apartment on Sunday morning and returned later that day without it. Another witness testified that shortly after the robbery had taken place he saw appellant in the vicinity walking along the road and stopped to offer him a ride. Once inside the vehicle, appellant asked the witness if he had heard about the murder in the cemetery. Mrs. Price had not at this time been found. In addition, appellant's fingerprints were found on a package of cigarettes in the front seat of the Prices' car.
The evidence against appellant, though circumstantial, was strong.
Appellant raises five points on appeal. First, he argues that the trial court erred in denying his motion for change of venue. It is his contention that, due to pretrial publicity, it was impossible for him to receive a fair and impartial trial in Bay County. Twenty-two of the prospective jurors examined admitted to having read about the case or having heard about it on the radio or television. Nine prospective jurors knew one of the victims or knew one or more of the witnesses who would testify at trial. This issue is governed by the test stated in Kelley v. State, 212 So.2d 27 (Fla.2d DCA 1968), which we adopted in McCaskill v. State, 344 So.2d 1276, Opinion filed April 7, 1977:
Knowledge of the incident because of its notoriety is not, in and of itself, grounds for a change of venue. The test for determining a change of venue is whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely upon the evidence presented in the courtroom. Singer v. State (Fla. 1959) 109 So.2d 7; Collins v. State (Fla.App. 1967) 197 So.2d 574, and cases cited therein. Kelley v. State, 212 So.2d at 28.
The prospective jurors, when questioned, stated that they could decide the issues between the state and the appellant based upon the evidence heard and the exhibits examined in the courtroom. We find nothing in the record to indicate that the trial judge abused his discretion in denying appellant's motion for change of venue.
In appellant's second point he attacks the constitutionality of Florida's death penalty. Similar attacks were rejected by this court in State v. Dixon, 283 So.2d 1 (Fla. 1973), and by the United States Supreme Court in Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). These cases are dispositive of this issue.
Appellant's third point involves the admission into evidence of three photographs taken of the victims and admitted over appellant's objections. It is appellant's contention that these pictures were unnecessary and served only to inflame the passions of the jury. Indeed, the pictures complained of are gruesome. However, as we stated in Young v. State, 234 So.2d 341 (Fla. 1970):
The fact that the photographs are offensive to our senses and might tend to inflame the jury is insufficient by itself to constitute reversible error, but the admission of such photographs ... must have some relevancy, either independently or as corroborative of other evidence. (footnotes omitted)
And again, in State v. Wright, 265 So.2d 361 (Fla. 1972):
[T]he current position of this Court is that allegedly gruesome and inflammatory photographs are admissible into evidence if relevant to any issue required to be proven in a case. Relevancy is to be determined in the normal manner, that is, without regard to any special characterization of the proffered evidence. Under this conception, the issues of "whether cumulative", or "whether photographed away from the scene," are routine issues basic to a determination of relevancy, and not issues arising from any "exceptional nature" of the proffered evidence.
See also Bauldree v. State, 284 So.2d 196 (Fla. 1973), and Swan v. State, 322 So.2d 485 (Fla. 1975). Applying this test of admissibility to this case, we hold that the photographs were relevant and that no error was committed in admitting them into evidence. However, we again caution the prosecutors of this state that gory and gruesome photographs admitted primarily to inflame the *1193 jury will result in a reversal of the conviction.
Appellant also challenges the admission of certain statements elicited at trial regarding the exercise of his Miranda rights. The Bay County Sheriff was sworn as a witness for the state and related the following facts: Upon arrest, appellant was advised of his constitutional rights pursuant to the procedure outlined in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), after which he discussed his whereabouts on the morning of the murders and described the clothing he was wearing on that date. The sheriff then warned Jackson that he was going to ask him questions regarding the two women who were murdered, whereupon the defendant stated, "I want a lawyer." It is appellant's contention that the sheriff's statement constitutes an impermissible comment upon appellant's exercise of his rights under the Fifth and Sixth Amendments to the United States Constitution. Appellant correctly states our holding in Bennett v. State, 316 So.2d 41 (Fla. 1975), that any comment upon a defendant's standing mute or silent or refusing to testify in the face of an accusation is fundamental error requiring reversal for a new trial. But this is not a Bennett situation. In Bennett the prosecutor elicited testimony from his own witness to the effect that after being advised of his constitutional rights, defendant "refused to sign the waiver... ." This statement suggests that defendant had a duty to respond and was held to be an impermissible comment on defendant's exercise of his Fifth Amendment rights. In the present case, the appellant's statement, "I want a lawyer" was brought out on cross-examination by counsel for the defense.[2] But for the insistence of appellant *1194 himself, the fact would not have come before the jury. Appellant cannot initiate error and then seek reversal based on that error. Gagnon v. State, 212 So.2d 337 (Fla.3d DCA 1968); Borst v. Gale, 99 Fla. 376, 126 So. 290 (1930).
Later that evening, after appellant had informed the sheriff that he wished to speak to a lawyer, but before a lawyer was summoned, appellant asked to speak to the chief investigator concerning the charges against him. At this time, appellant was again advised of his rights, whereupon he proceeded to make a statement. Although appellant denied any involvement in the murders for which he was later tried, the substance of the statement was damaging because it was inconsistent with prior statements. Appellant contends that the trial court erred in admitting the statement into evidence. We find no authority to uphold his position. There is nothing in the record to indicate that the interrogation by the sheriff did not cease once appellant requested an attorney. The decision to have a lawyer is not irrevocable. If the evidence shows, as it does in this case, that a defendant voluntarily seeks out a law enforcement officer to make a statement, after being fully advised of his rights on two occasions, he may do so, thereby waiving the protection afforded by Miranda. See Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), wherein the United States Supreme Court held that a statement given by defendant to an investigating officer was admissible even though the defendant had asserted his right to remain silent during an earlier interrogation that same day.
Having determined that no reversible error has been made to appear which would require a new trial, we proceed to examine the sentence imposed.
In the trial court's written findings,[3] upon which the sentence of death was based, the Court considered as a separate aggravating circumstance the fact that the murder of Mrs. Butler was committed for *1195 pecuniary gain [Section 921.141(5)(f), Florida Statutes (1973)] while appellant was engaged in the commission of a robbery [Section 921.141(5)(d), Florida Statutes (1973)]. We have held that this procedure constitutes error, at least where mitigating circumstances are present. Provence v. State, 337 So.2d 783 (Fla. 1976). Where there is a doubling up of aggravating circumstances, but no mitigating circumstances, as is the case here, a sentence of death may be upheld. Elledge v. State, 346 So.2d 998 (Fla. 1977).
Accordingly, the judgment is affirmed and the sentence of death upheld.
It is so ordered.
OVERTON, C.J., and ADKINS, ENGLAND, SUNDBERG and KARL, JJ., concur.
HATCHETT, J., concurs specially with an opinion.
BOYD, J., concurs in part and dissents in part with an opinion.
HATCHETT, Justice, concurring specially.
In Spenkelink v. State, 350 So.2d 85 (Fla. 1977), I expressed by belief that Section 921.141, Florida Statutes (1975), is unconstitutional on its face and as applied. Both the United States Supreme Court and this Court have held otherwise. I see no purpose to be served by reiterating my views in future cases where the death penalty is imposed.
BOYD, Justice, concurring in part, dissenting in part.
I concur in affirmance of the judgment of guilt. I dissent to upholding the sentence because of the improper doubling of the aggravating circumstances. Provence v. State, 337 So.2d 783 (Fla. 1976).
In a case where the stakes, life or death, are so great, I cannot treat that mistake as lightly as does the majority. I do not read Elledge v. State, 346 So.2d 998 (Fla. 1977), to hold otherwise. The existence of unknown mitigating circumstances in Elledge and the finding of none by the trial judge here is not a sufficient basis, to my mind, for not applying the Elledge reasoning. The following, from Elledge, summarizes my view,
Would the result of the weighing process by both the jury and the judge have been different had the impermissible aggravating factor not been present? We cannot know. Since we cannot know and since a man's life is at stake, we are compelled to return this case for a new sentencing trial at which the [impermissible factor] will not be considered. Elledge, at 1003.
I would vacate the sentence of death and remand for a new sentencing proceeding.
NOTES
[1] Appellant was also convicted of robbery and kidnapping for which he received the following sentences: life imprisonment on the robbery charge and 15 years on the kidnapping charge.
[2] Q All right, Sheriff, at this point did you show the defendant, this defendant, Carl Jackson, this is the defendant that you were talking to, right here? (Indicating.)

A Yes, sir.
Q Did you show Carl Jackson anything?
A Yes, sir.
Q All right, I show you State's Exhibit Number One for Identification and ask you if you can identify that?
A Yes, sir, this is a brown jacket which I took out of a bag and handed it toward Carl Jackson, and he said  I said, "Is this your jacket?" And he said, "That's my jacket."
Q If the Court please, we move to introduce the jacket as State's Exhibit Number One for Identification into evidence.
THE COURT: Do you desire to cross examine the witness?
MRS. COSTELLO: One moment, Your Honor.
THE COURT: Well, the Court will withhold ruling until the defendant has had the opportunity to cross examine the witness.
MR. JONES: You may inquire.
CROSS EXAMINATION BY MRS. COSTELLO:
Q How do you know this is the jacket that you showed Carl Jackson?
THE WITNESS:
A I initialed it, and the date, right here. Here are my initials and the date. (Indicating.)
Q Okay, and you put those on at that time?
A Yes, Ma'am.
Q Mr. Jackson said that was his jacket?
A Yes, Ma'am.
Q He had previously denied having a jacket, is that correct?
A Yes.
Q That was not in question and answer form, was it?
A Repeat that, please, Ma'am.
Q Sheriff, you just read the statement to the jury you say you took from Mr. Jackson. They were in question and answer form, is that correct?
A Yes.
Q And in that statement Mr. Jackson denied having a jacket, is that correct?
A There's two situations. He said he was wearing a jacket on one question in this statement, and then another one he said he wasn't wearing a jacket.
Q All right. Why wasn't this oral statement taken down and recorded by the stenographer?
A It was.
Q Not in question and answer form, was it?
A This 
Q The part where you say he admits that's his jacket, that particular jacket?
A I see what you're getting at. When I asked  he answered the question, "Why are you trying to say something?" And the question, it wasn't really a question, it was a statement, "I want to talk to you about those two women that were murdered."
Q At that point, that was the period where the stenographer stopped taking down questions and answers in that form, is that correct?
A Right. I reached down, there was a bag sitting at my feet, between Mr. Jackson and myself. I reached down and pulled this jacket out of the bag and handed it toward him, unfolded it, and said, "Is this your jacket?"
Q I understand that was your statement.
MR. JONES: Let the sheriff finish his explanation.
MRS. COSTELLO: I don't think he's responding to the question.
THE COURT: Go ahead and proceed.
THE WITNESS:
A What do you want me to do now?
(Laughter.)
THE COURT: Ladies and gentlemen, we are very happy to have all of you here in court. This is your court. You have a perfect legal right to be here. We want you here to see your court in operation. A man is on trial for his life here today. This is a very serious matter. There's nothing funny about it. Now, this is several times that we've had to have order in the courtroom. We do not wish to clear the courtroom. We wish to have you here so that you may see your court in operation. But, you must realize this. You must conduct yourselves accordingly. You may proceed.
MRS. COSTELLO: Thank you, Your Honor. Sheriff, I would just like for you to explain why the form that you had previously followed, asking questions and receiving responses that were recorded by the stenographer, why that was stopped.
THE WITNESS:
A The statement says 
Q Sheriff, I don't think 
THE COURT: Let him finish his answer.
THE WITNESS:
A I'm just reading the statement. The statement says  the suspect, at this point, said he didn't know anything about what we were talking about. At this point I pulled the jacket out. I said  at this point I pulled out a tan jacket from the bag and unfolded it and asked if that was his jacket. The suspect said it was, and I asked him where he left it and he said that he left it in the car. At this point, he said, "I want a lawyer."
[3] The Court finds, from the evidence, that sufficient aggravating circumstances exist as enumerated in Subsection (5) of Section 921.141, Florida Statutes, that justify a sentence of death, and that there are insufficient mitigating circumstances, as enumerated in Subsection (6) of said Section 921.141, to outweigh the aggravation circumstances. The aggravating circumstances found by the Court are as follows:

1. The murder of ANN PATTERSON BUTLER was committed while the Defendant was engaged in commission of a robbery.
2. The murder of ANN PATTERSON BUTLER was committed for pecuniary gain.
3. The murder of MARY FRANCES PRICE was committed while the Defendant was engaged in flight after committing a robbery.
4. The murder of MARY FRANCES PRICE was committed while the Defendant was engaged in the commission of the crime of kidnapping.
5. It is the Court's opinion, from the evidence, that both of the aforesaid capital felonies were committed for the additional purpose of avoiding a lawful arrest.