417 So.2d 631 (1982)
John Errol FERGUSON, Appellant,
v.
The STATE of Florida, Appellee.
No. 55498.
Supreme Court of Florida.
July 15, 1982.
*633 Michael S. Hacker of Hacker, Phelps & Matters, Miami, for appellant.
Jim Smith, Atty. Gen., and Margarita Esquiroz and Calvin L. Fox, Asst. Attys. Gen., Miami, for appellee.
ADKINS, Justice.
Appellant, John Errol Ferguson, was found guilty on two counts of first-degree murder, one count of involuntary sexual battery, one count of robbery, one count of attempted robbery, one count of unlawful possession of a firearm while engaged in a criminal offense, and one count of possession of a firearm by a convicted felon. He now appeals his convictions on the above and the resulting sentences of death and imprisonment. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
Brian Glenfeld and Belinda Worley were last seen leaving a Youth for Christ meeting around 9:00 p.m. on Sunday, January 8, 1978. The two seventeen-year-olds were supposed to meet friends at an ice cream parlor. The next morning their bodies were discovered in a wooded area by two passersby.
Brian's body was behind the wheel of the car. He'd been shot in the chest and arm. A bullet to the head had killed him. Belinda's body was several hundred yards away in a dense growth. All she had on were her jeans; her other clothes were next to her body. She'd been shot in the back of the head. An autopsy indicated she'd been raped.
Brian's father testified that Belinda was wearing two rings, a gold bracelet and a pair of earrings when she and Brian left on Sunday evening. None of the jewelry was found with the bodies. Belinda's earlobe was torn where an earring had been taken. Brian's empty wallet was found in Belinda's purse near her body. His father had seen both the wallet and some cash in Brian's possession the previous evening.
On April 5, 1978, the defendant was arrested at his apartment pursuant to a warrant for unlawful flight to avoid prosecution; he was under indictment for another multiple-murder, the so-called Carol City murders. The defendant was read his Miranda rights each time he was questioned. He signed a consent to search form and allowed the officers to search the apartment. His roommate, Virginia Polk, also consented to the search. After the search, which produced probable evidence in another robbery, the defendant confessed to killing the "two kids." At the time of his arrest he had in his possession a .357 magnum capable of firing .38 caliber bullets like those which killed Brian and Belinda.
The gun was registered to Livingston Stocker, a victim of the Carol City murders. Margaret Wooden, a survivor of that incident, testified that the defendant had been in Stocker's Carol City house on July 27, 1977, the night he was murdered.
*634 The defendant was convicted on two counts of first degree murder. The jury recommended the death penalty and the judge concurred in imposing the death sentence.
We reject the constitutional challenges to the death penalty. It is neither cruel and unusual punishment, Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), nor a violation of due process or equal protection. Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 918 (1976).
The trial court denied defendant's pre-trial motions to suppress statements made on April 5, 1978, the day of his arrest. Evidence at the suppression hearing showed that defendant was represented by counsel as of about 3:00 p.m. the day he was taken into custody. Defendant's attorney visited his client and claimed that he advised the officers involved that he didn't want anyone talking to his client unless he was present. This was contradicted by the state's evidence and the trial court found that such communication did not take place. The defendant was questioned at least twice after this and admitted the crimes without his attorney being present.
The trial judge in the case before us specifically found that the defendant knowingly and voluntarily waived his Fifth Amendment right. Witt v. State, 342 So.2d 497 (Fla.), cert. denied, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977). The waiver is effective even though the defendant is represented by counsel and the officers are aware of that fact. United States v. Brown, 569 F.2d 236 (5th Cir.1978); United States v. Vasquez, 476 F.2d 730 (5th Cir.1973). The defendant in this case was questioned by three different officers investigating three separate incidents. Each time he was approached, the defendant was advised of his rights and clearly consented to talking without an attorney. When he finally did ask to speak with his lawyer, all questions ceased. Michigan v. Moseley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). The statements were properly admitted into evidence.
The trial court also admitted physical evidence taken from defendant's apartment on the day of his arrest. The detective who searched the apartment did so after obtaining consent from a woman who had been living with the defendant. The test for a valid third-party consent to a warrantless search is whether the third party has joint control of the premises. United States v. Matlock, 415 U.S. 164, 98 S.Ct. 218, 54 L.Ed.2d 152 (1974); Silva v. State, 344 So.2d 559 (Fla. 1977). In this instance the entire living space, including closets, of the one-bedroom apartment had been shared by the defendant with the third party. At the suppression hearing there was conflicting evidence as to whether the woman had ceased to reside in the apartment a few days earlier. The trial court resolved this question against the defendant, finding that the third party had joint access and control at the time she gave permission. There is nothing in the record to overcome the presumption of correctness with which that finding reaches this Court. State v. Nova, 361 So.2d 411 (Fla. 1978).
Having found a valid third-party consent, we need not reach the validity of the defendant's consent in signing a consent to search form. The evidence obtained at the apartment was not taken in violation of defendant's constitutional rights.
Yet another pre-trial motion was denied by the trial court; this alleged that the defendant was insane at the time of the offense and incompetent to stand trial at all times thereafter. The Florida standard for sanity at the time of the offense is the ability to distinguish right and wrong. Witt v. State; Wheeler v. State, 344 So.2d 244 (Fla. 1977), cert. denied, 440 U.S. 924 (1979). The test for competency to stand trial is whether a defendant has sufficient present ability to consult with and aid his attorney in the preparation of a defense with a reasonable degree of understanding. Although the medical evidence was conflicting, there was adequate testimony to support the trial judge's finding that defendant was competent to stand trial. Byrd v. *635 State, 297 So.2d 22 (Fla. 1974); Fowler v. State, 255 So.2d 513 (Fla. 1971), later appeal, 263 So.2d 202 (Fla. 1972). Defendant's sanity at the time of the offense was a factual issue determined adversely to him by the jury's verdict. The evidence is sufficient to sustain this finding by the jury.
During the trial, Margaret Wooden was allowed to testify over defendant's objection that the defendant had been present at the scene of the Carol City murders. The trial court properly denied the defense motion for a mistrial since this evidence tended to establish the defendant's identity as perpetrator of the crime. Dean v. State, 277 So.2d 13 (Fla. 1973); Ashley v. State, 265 So.2d 685 (Fla. 1972); Williams v. State, 110 So.2d 654 (Fla. 1959). One of the crucial pieces of evidence in this case was the.357 magnum revolver found in defendant's possession upon his arrest. Since nearly four months had elapsed between the date of the crime and the date of arrest, the point at which defendant obtained possession of the weapon was obviously important to the state's case. Another witness testified he'd been present in Stocker's house on July 27, 1977, when a similar .357 magnum was taken from the bedroom. Margaret Wooden was the only person who could place the defendant in Stocker's house on that date, some five and one-half months prior to the day the two teenagers were killed. Review of the testimony shows that both the court and the prosecutor made every effort to avoid prejudicing the defendant by referring to the Carol City homicides. The record supports the admission of the evidence as relevant to identity.
The defendant also contends that the prosecutor improperly commented in closing argument on the defendant's failure to testify:
[S]o there is a lot of reasons why that glitter was on that blue shirt and you'll also remember John Ferguson said, excuse me, Virginia Polk said that John Ferguson washed the clothes... .
Taken in context, the prosecutor obviously said the defendant's name when he meant to say Virginia Polk. He immediately corrected the error. This is not an example of resort to improper methods to obtain convictions as suggested by the defendant. Rolle v. State, 268 So.2d 541 (Fla. 3d DCA 1972). The trial court acted within its discretion in denying the defendant's motion for mistrial. Johnsen v. State, 332 So.2d 69 (Fla. 1976).
At the close of the state's case the defendant moved for a judgment of acquittal on the two counts of robbery. The court denied the motions and the jury found defendant guilty of robbery of Brian and attempted robbery of Belinda. In circumstantial evidence cases the evidence must not only be consistent with guilt but also be inconsistent with any reasonable hypothesis of innocence. Davis v. State, 90 So.2d 629 (Fla. 1956). The crux of the matter is that all the state could show was that the victims had valuables on their persons before they were killed and that the jewelry was missing when the bodies were discovered. The defense argues that since the bodies were in the wooded area overnight, anyone passing by could have stolen the money and jewelry. We agree with the state that this is not a reasonable hypothesis of innocence: there was evidence that the jewelry was taken with some degree of violence; it rained very hard that night; and the bodies were found just a few hours after sunrise. See People v. Hubler, 102 Cal. App.2d 689, 228 P.2d 37 (2d Dist. 1951).
The defendant's final point on appeal concerns the actual execution of the death sentence. Essentially he argues that he has a First Amendment right to have his execution televised. We need not reach the merits of this argument inasmuch as the claim is not properly before this Court. The execution of the death sentence is regulated by statute and carried out by the Department of Corrections, a part of the executive branch of government. § 922.10 and .11, Fla. Stat. (Supp. 1978). The defendant raised this issue in a post trial motion before the trial court. Other than specifically described post trial motions, there is no jurisdictional basis for that court to act in this cause after the imposition of sentence. *636 See, e.g., Fla.R.Crim.P. 3.700; 3.810; and 3.850.
The trial court made written findings of fact in support of the death sentence. The finding, as an aggravating circumstance, that the defendant was under a sentence of imprisonment at the time that he committed the crimes for which he was sentenced is improper. At the time of the murders, defendant was serving a two-year period of probation which followed an eighteen-month period of incarceration. He was not confined in prison at the time, nor was he supposed to be. In Peek v. State, 395 So.2d 492 (Fla. 1981), cert. denied, 451 U.S. 964, 101 S.Ct. 2036, 68 L.Ed.2d 342 (1981), we held that:
Persons who are under an order of probation and are not at the time of the commission of the capital offense incarcerated or escapees from incarceration do not fall within the phrase "person under sentence of imprisonment" as set forth in section 921.141(5)(a).
Id. at 499. Thus defendant was not a "person under sentence of imprisonment."
Our negation of said aggravating circumstance would not, however, change the result of this case in the absence of mitigating circumstances. In such cases, a reversal of the death sentence is not necessarily required, as any error that occurred in the consideration of the inapplicable aggravating circumstances was harmless. See Shriner v. State, 386 So.2d 525 (Fla. 1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 899, 66 L.Ed.2d 829 (1981); Dobbert v. State, 375 So.2d 1069 (Fla. 1979), cert. denied, 447 U.S. 912, 101 S.Ct. 3000, 64 L.Ed.2d 862 (1980).
The trial court also found that the defendant had previously been convicted of three felonies involving the use of threat or violence to some person and that the crime was committed in the commission of a robbery and for the purpose of avoiding or preventing a lawful arrest. In support of the latter, the court observed:
It is obvious that the execution style of terminating the lives of the two victims was the result of a thoughtful plan to make certain that there would be no witnesses to the robberies and/or the involuntary sexual battery committed. This conduct is reflective of a well thought out plan to make certain that this defendant would not be discovered or his identity ever revealed.
The final finding in aggravation was that the crime was especially heinous, atrocious, and cruel:
The facts reveal that the two victims were seated in an automobile and while seated therein a gunshot was fired through the window striking Brian Glenfeld in the arm and chest area. A significant amount of bleeding followed and this victim's blood was found throughout many areas of the front of the automobile as well as on the clothing of Belinda Worley. Following the shooting, the female victim ran many hundreds of feet from the car in an attempt to allude [sic] the defendant and was finally overtaken in some rather dense overgrowth and trees. She was subjected to many physical abuses by this defendant, including but not limited to, sexual penetration of her vagina and anus. The discovery of embedded dirt in her fingers, on her torso both front and back and in many areas within her mouth and the findings of hemorrhaging around her vagina and anal cavity would indicate that she put up a significant struggle and suffered substantially during the perpetration of these indignities upon her body. Expert testimony indicates that she was a virgin at the time of the occur[r]ence of this crime. The position of her body and the location of the wounds on her head would indicate that she was in a kneeling position at the time she was shot through the top of the head. She was left in a partially nude condition in the area where the crime was committed to be thereafter fed upon by insects and other predators. Physical evidence would substantiate that following the attack upon Belinda Worley the defendant went back to the car and shot Brian Glenfeld through the head.
See § 921.141(5), Fla. Stat. (1977).
The only possible mitigating circumstance involved the defendant's mental state and *637 his ability to appreciate the criminality of his conduct. § 921.141(6)(b) and (f), Fla. Stat. (1977). In rejecting this as a mitigating factor the trial court said:
At the time of an appearance before the Court on another matter wherein a plea of not guilty by reason of insanity was entered the Court appointed three disinterested psychiatrists; Drs., Harry Graff, Charles Mutter and Albert Jaslow. Subsequent thereto, Dr. Norman Reichenberg was also appointed to do psychological testing.
This defendant has a history of mental disorder and has been previously committed to The State Hospital. His mental disorder has been the subject of more than one diagnosis. He was found competent prior to his sentencing in The Criminal Division of the Circuit Court of the Eleventh Judicial Circuit in and for Dade County, Florida, in 1976, and thereafter concluded his period of incarceration in The State Prison System and was placed on probation. Following the filing of the reports by the referenced physicians and in a pre-trial conference, counsel represented the defendant in the other pending matter indicating that he was not going to present the issue of insanity in that case. This Court thereafter specifically found that the defendant was competent to stand trial, to understand the seriousness of the charges and able to assist his counsel in his defense. During the trial of the other matter which took place in May, 1978, the defendant aided his counsel and participated in his own defense. During the course of that trial he made some observations about people in the courtroom and these observations were minimally disruptive. His comments at that time were consistent with a person diagnosed as a sociopath.
Communications by the defendant to the Court following adjudication in the other matter relating to his treatment in the jail and his inability to have confidence in his Court appointed counsel to represent him in the instant case caused this Court to hold a hearing which ultimately led to the release of prior counsel and appointment of an attorney requested by the defendant who had represented him or members of his family in other matters. Upon the appointment of the new counsel, Michael Hacker, Esquire, additional physicians were retained by the defendant and a plea of not guilty by reason of insanity was filed in the instant case. A hearing was duly called to determine not only the defendant's competency to be tried on the instant case but also a test of his competency at the time of the commission of the crimes in the other matter and at the trial of the other matter. Testimony was taken from at least seven professional witnesses, all with generally conflicting opinions and/or evidence upon which opinions were reached. This Court determined that the defendant was competent to aid counsel at the time of the trial of the instant case, was competent at the trial of the last case, was competent at the commission of the crimes in the instant case and at the times of the commission of the crimes in the other matter. The Court specifically held that the defendant knew the difference between right and wrong and was able to recognize the criminality of his conduct and to make a voluntary and intelligent choice as to his conduct based upon knowledge of the consequences thereof.

The defendant has been diagnosed as suffering from a number of mental disorders: a basic paranoia schizophrenia psychotic process; Ganser syndrome; malingering, and a behavior characteristic commonly referred to as sociopathic. This defendant's conduct from crime through trial is indicative of an individual who has an absolute understanding of the events and the consequences thereof. There is nothing that would indicate that this defendant did not recognize the criminality of his conduct at the time of the commission of the subject offenses. The evidence requires the finding that this defendant was sane at the time of the commission of the instant offense consistent with the standards of the M'Naghten *638 Rule and therefore this mitigating circumstance is not applicable. (Emphasis supplied.)
Apparently the judge applied the wrong standard in determining the presence or absence of the two mitigating circumstances related to emotional disturbance, so we have no alternative but to return this case to the trial judge for resentencing. As we stated in Mines v. State, 390 So.2d 332, 337 (Fla. 1980), cert. denied, 447 U.S. 1, 101 S.Ct. 1994, 64 L.Ed.2d 681 (1981):
Under the provisions of section 921.141(6), Florida Statutes (1975), there are two mitigating circumstances relating to a defendant's mental condition which should be considered before the imposition of a death sentence: "(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance"; and "(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." From the record it is clear that the trial court properly concluded that the appellant was sane, and the defense of not guilty by reason of insanity was inappropriate. The finding of sanity, however, does not eliminate consideration of the statutory mitigating factors concerning mental condition.
The sentencing judge here, just as in Mines; misconceived the standard to be applied in assessing the existence of mitigating factors (b) and (f). From reading his sentencing order we can draw no other conclusion but that the judge applied the test for insanity. He even referred to the "M'Naghten Rule" which is the traditional rule in this state for determination of sanity at the time of the offense. It is clear from Mines that the classic insanity test is not the appropriate standard for judging the applicability of mitigating circumstances under section 921.141(6), Florida Statutes.
In the absence of any mitigating factors, the death sentence would be held appropriate on review. Other execution style murders have warranted imposition of the ultimate penalty. See Jackson v. State, 359 So.2d 1190 (Fla. 1978), cert. denied, 439 U.S. 1102, 99 S.Ct. 881, 59 L.Ed.2d 63 (1979); Gibson v. State, 351 So.2d 948 (Fla. 1977), cert. denied, 435 U.S. 1004, 98 S.Ct. 1661, 56 L.Ed.2d 93 (1978); and Sullivan v. State, 303 So.2d 632 (Fla. 1974), cert. denied, 428 U.S. 911, 96 S.Ct. 3226, 49 L.Ed.2d 1220 (1976). Evidence of mental or emotional distress does not necessarily outweigh a heinous, atrocious or cruel crime. Foster v. State, 369 So.2d 928 (Fla.), cert. denied, 444 U.S. 885, 100 S.Ct. 178, 62 L.Ed.2d 116 (1979).
However, in our review capacity we must be able to ascertain whether the trial judge properly considered and weighed these mitigating factors. Their existence would not as a matter of law, invalidate a death sentence, for a trial judge in exercising a reasoned judgment could find that a death sentence is appropriate. It is improper for us, in our review capacity, to make such a judgment.
The judgment of conviction is affirmed. The death sentence is vacated and the cause is remanded to the trial court for the purpose of determining an appropriate sentence. An additional sentence advisory verdict by a jury is not required.
ALDERMAN, C.J., and OVERTON and McDONALD, JJ., concur.
SUNDBERG, J., concurs in result only.
BOYD, J., concurs in part and dissents in part with an opinion.
BOYD, Justice, concurring in part and dissenting in part.
I would affirm the convictions and would also affirm the death penalty.