417 So.2d 639 (1982)
John Errol FERGUSON, Appellant,
v.
STATE of Florida, Appellee.
No. 55137.
Supreme Court of Florida.
July 15, 1982.
*640 Michael S. Hacker of Hacker, Phelps & Matters, Miami, for appellant.
Jim Smith, Atty. Gen., and Margarita Esquiroz and Calvin L. Fox, Asst. Attys. Gen., Miami, for appellee.
ADKINS, Justice.
This is a direct appeal from an order adjudging the appellant guilty of six counts of murder in the first degree, two counts of attempted murder in the first degree, and three counts of robbery with a firearm, and imposing sentences of death and imprisonment. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
On July 27, 1977, at approximately 8:15 p.m. the defendant, posing as an employee of the power company, requested permission from Margaret Wooden to enter her Carol City home and check the electrical outlets. After gaining entry and checking several rooms, the defendant drew a gun and tied and blindfolded Miss Wooden. He then let two men into the house who joined the defendant in searching for drugs and money.
Some two hours later, the owner of the house, Livingston Stocker, and five friends returned home. The defendant, who identified himself to Miss Wooden as "Lucky," and his cohorts tied, blindfolded and searched the six men. All seven victims were then moved from the living room to the northeast bedroom.
Shortly thereafter, Miss Wooden's boyfriend, Miller, entered the house. He too was bound and searched. Then he and Miss Wooden were moved to her bedroom and the other six victims returned to the living room.
*641 At some point one intruder's mask fell, revealing his face to the others. Miller and Wooden were kneeling on the floor with their upper bodies lying across the bed. Wooden heard shots from the living room then saw a pillow coming toward her head. She was shot. She saw Miller get shot then heard the defendant run out of the room. She managed to get out and run to a neighbor's house to call the police.
When the police arrived they found six dead bodies. All had been shot in the back of the head, their hands tied behind their backs. One of the victims, Johnnie Hall, had survived a shotgun blast to the back of his head. He testified to the methodical execution of the other men.
On September 15, 1977, the defendant and three co-defendants were indicted for the offense. Adolphus Archie, the "wheelman", was allowed to plead guilty to second degree murder and a twenty-year concurrent sentence on all counts in exchange for testimony at trial. He testified he'd dropped the defendant, Marvin Francois, and Beauford White in the Carol City area to "rip off" a drug house. He didn't see the actual shooting but later saw unfamiliar weapons and jewelry in Beauford's and Francois' possession.
The defendant was tried alone and convicted on all counts. After an advisory sentencing hearing the jury recommended death. The judge followed that recommendation.
Four issues are raised on appeal. One is patently without merit. The death penalty in Florida as prescribed in section 921.141, Florida Statutes (1977), has been upheld repeatedly against arguments that it constitutes cruel and unusual punishment or violates the constitutional guaranties of equal protection and due process. See Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 918 (1976); Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978).
A second issue raised by defendant was that the trial court had failed to provide written findings in support of the sentence of death. § 921.141(3), Fla. Stat. (1977). Inasmuch as the supplemental record includes the trial judge's written findings this issue is now moot.
The third issue involves the following allegedly improper comment by the prosecution in closing argument: "[N]ot only did [defense counsel] ask you to find a scapegoat for Mr. Ferguson's guilt, he puts the blame on someone else who has already been found guilty, Marvin Francois." A victim had identified Francois as an accomplice and the wheelman also implicated Francois. The defendant thus argues that the above comment said to the jury, if Francois is guilty then, ipso facto, defendant must be guilty.
There are several reasons we decline to find reversible error in this comment. First, the only objection made to the comment was a general one, followed by a motion for a mistrial. It is well settled that objections must be made with sufficient specificity to apprise the trial court of the potential error and to preserve the point for appellate review. Castor v. State, 365 So.2d 701 (Fla. 1978); Clark v. State, 363 So.2d 331 (Fla. 1978). The desirability and need for specified grounds also apply to motions for mistrials. A mistrial is a device used to halt the proceedings when the error is so prejudicial and fundamental that the expenditure of further time and expense would be wasteful if not futile. Johnsen v. State, 332 So.2d 69 (Fla. 1976). Even if the comment is objectionable on some obvious ground, the proper procedure is to request an instruction from the court that the jury disregard the remarks. A motion for mistrial is addressed to the sound discretion of the trial judge and "the power to declare a mistrial and discharge the jury should be exercised with great care and should be done only in cases of absolute necessity." Salvatore v. State of Florida, 366 So.2d 745, 750 (Fla. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (citations omitted). Even if the general objection and request for a mistrial properly preserved this point for appellate review, we find that *642 the trial judge correctly denied the motion. The comment was made on rebuttal in response to the theory presented by the defense during its closing argument that Francois and White had committed the crime and the defendant had never even been in the house, but had been misidentified by the victims. The prosecutor's comment fell within the bounds of a "fair reply" which is permissible in this instance. See Brown v. State, 367 So.2d 616 (Fla. 1979). Viewed in this context, the comment on Francois' guilt was not sufficiently prejudicial to warrant a mistrial in this case. Cf. Thomas v. State, 202 So.2d 883 (Fla. 3d DCA 1967) (prosecutor told jury of accomplice's conviction during voir dire and again during trial); and Moore v. State, 186 So.2d 56 (Fla. 3d DCA 1966) (judge announced co-defendant's guilty plea to jury as explanation for recess during trial). The fact that a jury hears of an accomplice's guilt does not necessarily constitute reversible error. See, e.g., Sanders v. State, 241 So.2d 430 (Fla. 3d DCA 1970); Walters v. State, 217 So.2d 615 (Fla. 2d DCA 1969); Vitiello v. State, 167 So.2d 629 (Fla. 3d DCA 1964); Grisette v. State, 152 So.2d 498 (Fla. 1st DCA 1963).
Defendant's final point on appeal concerns the testimony of Adolphus Archie, the "wheelman" who was allowed to plead to second degree murder for testifying. On direct examination Archie stated that the defendant knew Joe Swain (the person who allegedly orchestrated the killings) because "the first time ... my first time in prison, all three of us was together." A general objection was overruled and a motion for mistrial denied. Initially, we reiterate our emphasis on the importance of stating specific grounds for objections and motions for mistrials. Also, especially in an instance such as this, a curative instruction should be requested. The defendant now contends that a prior imprisonment was irrelevant to his guilt or innocence in this case; the only result would be to show the defendant's "bad character." Such remarks may be erroneously admitted yet not be so prejudicial as to require reversal. Darden v. State, 329 So.2d 287 (Fla. 1976), cert. denied, 429 U.S. 1036, 97 S.Ct. 729, 50 L.Ed.2d 747 (1977); Thomas v. State, 326 So.2d 413 (Fla. 1975). In Smith v. State, 365 So.2d 405 (Fla. 3d DCA 1978), the court noted that any prejudice arising from the admission of testimony indicating defendant's prior incarceration could have been corrected by an instruction to the jury to disregard the testimony. The court held that in the absence of a defense request for such an instruction, the trial court properly denied the motion for a mistrial. Our review of this record persuades us that the admission of Archie's testimony in this matter was not so prejudicial as to warrant a reversal. See Clark v. State, 363 So.2d 331 (Fla. 1978).
The defendant in this case has not specifically attacked the sufficiency of the evidence supporting the conviction. It is nonetheless our duty to review the entire record. Tibbs v. State, 337 So.2d 788 (Fla. 1978). It is abundantly clear that the evidence was sufficient and we therefore uphold the conviction.
We have also conducted an independent review of the sentencing proceedings and trial court's findings in aggravation and mitigation. Harvard v. State, 375 So.2d 833 (Fla. 1977). That court found:
In support of this determination, the Court makes the following Findings of Fact relative to aggravating circumstances, consistent with Section 921.141(5) Florida Statutes.
(a) The crime for which the defendant was sentenced was committed while the defendant was under sentence of imprisonment. He had been convicted in The Circuit Court of the Eleventh Judicial Circuit in Case No. 76-4822, On September 16, 1976, of resisting an officer with violence and had been sentenced to The State Penitentiary for eighteen months to be followed by two years of probation. The sentence in the 76-4822 case had not been terminated and the case was still open. By stipulation the evidence in the subject case was adopted in the Probation Violation case and the probation was revoked by this Court on May 25, 1978.
*643 (b) At the time of the crime for which this defendant was sentenced he had previously been convicted of three felonies involving the use or threat of violence to some person;
1. Eleventh Judicial Circuit No. Cr. 2237, Assault with Intent to Commit Rape, October 15, 1965, Judge Harold R. Vann, sentence ten years.
2. Eleventh Judicial Circuit Case No. 69-9963, Robbery, February 22, 1971, Judge Alto Adams.
3. Eleventh Judicial Circuit Case No. 76-4822, resisting officer with violence to his person. Eighteen months State Prison, followed by two years probation. September 16, 1976, Judge Alan R. Schwartz.
(c) The defendant, in committing the crime for which he is sentenced, knowingly created a great risk of death to many persons. For a number of hours the defendant and others held at bay, tied and otherwise incapacitated any one who entered the premises following this defendant's original entry thereto. The original resident, Miss Wooden, was first tied and about two hours later Mr. Stocker and his five friends arrived. They were confronted and under threat of injury, tied and silenced. Thereafter Miss Wooden's boy friend, Michael Miller, arrived and was tied and placed with the others. We can only speculate as to what would have happened had additional people such as friends or delivery personnel shown up during the course of this crime. Suffice it to say that all eight people were shot and six of these people died as a result of the gunshot wounds inflicted upon them during the perpetration of the enumerated crime of robbery. The evidence indicated that the sole person to initially be robbed was victim Stocker, but because a young lady and her boy friend also resided in the home (unknown to the defendant and his accomplices when the crime was planned), and that Stocker arrived with five friends automatically placed all of them in a position of being exterminated.
(e)(g) The crime for which this defendant has been sentenced was committed for the purpose of avoiding or preventing a lawful arrest and to disrupt or hinder the lawful exercise of law enforcement. The evidence is myriad as to the effort put forth by the participants in this crime in making certain that their crime of robbery would go undetected. These include but are not necessarily limited to factors such as the avoidance of touching areas where the prints might be left; the use of barrels of weapons they carried to turn lights on or off; the application of grease in the car used, the use of masks; the hiding of one of the automobiles involved and the placing in the junk yard the other; the disposal of guns that were used by throwing them into the Miami River and the ultimate attempt to annihilate all possible witnesses to the robbery. It's obvious that great care was used by the participants while inside the residence or the vehicles in that only one out of more than five hundred fingerprints could be directly attributed to any of the four participants in this crime.
(d)(f) The crime for which the defendant has been sentenced was committed while engaged in a robbery for pecuniary gain. A substantial amount of money, jewelry and other personal effects were taken from the various victims or in hiding places or drawers in the residence and the money was divided equally among the four perpetrators of the robbery at a meeting following the escape from the residence of the crime.
(h) This crime was especially heinous, atrocious and cruel. The defendant first approached the house posing as a Florida Power and Light employee and went through Mr. Stocker's residence, in the company of Miss Wooden, presumably checking on electrical outlets. Finally he pressed a gun to the back of Miss Wooden's neck and told her to remain quiet while he went about his other business. He tied her hands behind her back and then on numerous occasions had her moving in and around the house. He subsequently put a stocking around her eyes and then a towel and forced her to lie down on her bed. He thn [sic.] got her up and took her blindfold off and made her respond to the front door *644 where a visitor had approached. While she was talking to this visitor with her hands tied behind her back, a pistol was pointed at her a short distance away where the defendant was hiding behind the front door.
She was then taken back to her room blindfolded and told to lay across the bed. Other men came into the house and she was told that these men would be good to her. She heard voices moving around the house and was asked for gloves. One of the participants said her hands were tied too loosely and he re-tied her hands and her blindfold. She was tied so tightly that it affected her breathing because she was an asthmatic and was required to take medication to aid her. As she was laying across the bed she could hear people ransacking the house and was asked to disclose the location of her purse so that it could also be examined. She was unblindfolded and told to determine the ownership of a car which was parked outside and at that time she noticed that all the participants in this crime were carrying weapons. Following her identification of the cadillac she was returned to her room, blindfolded and put back on the bed. Almost two hours passed until Stocker arrived. She was told to be quiet and she said, "Don't hurt me, I'll be good". She was crying and thought of dying.
She was blindfolded again and returned to the living room where six men were laying on the floor. Two of them were in the dining area and four in the living room. Their hands were tied behind their back and the defendant and his co-conspirators were going through their pockets and asking for money and drugs. She watched as a shotgun was brought out of Mr. Stocker's room and one of the men put the shotgun to her head and said, "Give us something or we will kill her". All seven people were then moved into the northeast bedroom where all of them were pleading for their lives. One of the victims was heard to have said that he had been brought up with one of the defendants and shouldn't be hurt.
She next heard Michael Miller scream as he came into the house. She yelled to them not to hurt him. Mr. Miller was then tied, searched and brought into the bedroom. Ferguson then took Miss Wooden and Mr. Miller back to their bedroom with Ferguson again helping her as she moved along. Ferguson told her not to worry that everything was going to be alright and she and Miller were instructed to kneel down next to the bed with their bodies across the bed. She then heard some sounds that sounded like shots from the other part of the house and saw a pillow coming towards her head. She was then shot and then watched Michael get shot. She then heard Ferguson run out of the room. She screamed hysterically for Michael, then got up and got her blindfold off and saw the dead men in the other room. She was able to open the front door and ran screaming to the next door neighbor's house.
While the six men remained in Stocker's bedroom Stocker was heard to cry to God for His help in stopping what he thought was going to take place. Stocker was told "Shut up nigger" (all participants and victims of this crime were of the black race) and his prayers were further interrupted by a shotgun blast to the back of his head. The other gentlemen in the room were then methodically shot by either a shotgun or a pistol into the backs of their heads. Miraculously one of this group survived as did Miss Wooden. The method of execution used by this defendant and his co-conspirators reflects not only an absolute lack of concern for human life or dignity but also that of a consciousless or pitiless individual.
A careful consideration of all matters presented to the Court compels the following Findings of Fact relating to mitigating circumstances as specified by Section 921.141(6) Florida Statutes:
(a) The defendant does have a significant history of prior criminal activity. (see aggravating circumstances Supra)
(b)(f) The defendant was not under the influence of any extreme mental or emotional disturbance and his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired.
*645 At the time of his arraignment on the instant charges his counsel entered a plea of "not guilty by reason of insanity". The Court appointed three disinterested psychiatrists; Drs. Harry Graff, Charles Mutter and Albert Jaslow. Subsequent thereto Dr. Norman Reichenberg was also appointed to do psychological testings.
This defendant has a history of mental disorder and has previously been committed to The State Hospital. He was found competent prior to his sentencing in 1976, thereafter concluded this period of time in The State Prison System and was placed on probation. Following the filing of the reports by the referenced physicians and in a pre-trial conference counsel for the defendant, after consultation with his client, indicated that he was not going to present the issue of insanity to this jury. This Court specifically found that the defendant was competent to stand trial, to understand the seriousness of the charges and able to assist his counsel in his defense. There is nothing that would indicate that this defendant did not recognize the criminality of his conduct at the time of the commission of the referenced offenses. The evidence requires a finding that defendant was sane at the time of the commission of the instant offense consistent with the standards of the "M'Naghten Rule".
This defendant's conduct throughout the entire course of this crime from planning state through escape is indicative of a[n] individual who had an absolute understanding of the events and consequences thereof.
(c) The victims of this crime were not participants in the defendant's conduct and did not consent to the crimes involved.
(d) The defendant was a principal participant in the planning and execution of the robbery plans and all actions following the leaving of the scene of the crime which were designed to aid in avoiding detection. His participation constituted a major part of the total criminal activity involved. He was personally responsible for shooting two of the victims, killing one of them.
(e) There is nothing in the evidence in this case that would indicate that this defendant was under extreme duress or under the substantial domination of any other person. He was a[n] active participating principal throughout the course of these crimes, gave directions and dictated to some extent directions to be followed by others involved.
(g) There is nothing about the defendant's age of approximately thirty years which in any way could be considered a mitigating factor in this case.
Upon consideration it was at the time of the sentencing, and is now, during the formulation of the written Order, the inescapable conclusion of the Court that sufficient aggravating circumstances exist and that no mitigating circumstances exist which could possibly outweigh the aggravating circumstances. Accordingly, this Court agrees with the recommendation of the trial jury that the crime involved in this case justifies, warrants and cries out for the imposition of the death penalty.
The only possible mitigating circumstances involved the defendant's mental state and his ability to appreciate the criminality of his conduct. § 921.14(6)(b) and (f), Florida Statutes (1977). In rejecting these the sentencing judge here, just as in Mines v. State, 390 So.2d 332, 337 (Fla. 1980), cert. denied, 447 U.S. 1, 101 S.Ct. 1994, 64 L.Ed.2d 681 (1981), misconceived the standard to be applied in assessing the existence of these mitigating factors. Apparently the judge applied the test for insanity, just as he did in Ferguson v. State, 417 So.2d 631 (1982). The sentence in the latter case was vacated and the case was remanded to the trial judge for sentencing. We must follow the same procedure here.
The trial court's finding in aggravation that defendant knowingly created a great risk of death to many persons was improper. In White v. State, 403 So.2d 331 (March 20, 1981), we held that said aggravating circumstance was inapplicable with regard to defendant's accomplice, Beauford White, and for the reasons expressed therein we hold likewise in the case sub judice.
*646 Also improper was the finding, as an aggravating circumstance, that defendant was under a sentence of imprisonment at the time that he committed the crimes for which he was sentenced. At the time of the murders, defendant was serving a two-year period of probation which followed an eighteen-month period of incarceration. He was not confined in prison at the time, nor was he supposed to be. In Peek v. State, 395 So.2d 492 (Fla. 1981), cert. denied, 451 U.S. 964, 101 S.Ct. 2036, 68 L.Ed.2d 384 (1981), we held that:
Persons who are under an order of probation and are not at the time of the commission of the capital offense incarcerated or escapees from incarceration do not fall within the phrase "person under sentence of imprisonment" as set forth in section 921.141(5)(a).
Id. at 499. Thus defendant was not a "person under sentence of imprisonment."
Our negation of two of the aggravating circumstances found by the trial court would not change the result of this case in the absence of mitigating circumstances for there remain four valid aggravating circumstances. In such cases, a reversal of the death sentence would not necessarily be required, as any error that occurred in the consideration of the two inapplicable aggravating circumstances was harmless. See Shriner v. State, 386 So.2d 525 (Fla. 1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 899, 66 L.Ed.2d 289 (1981); Dobbert v. State, 375 So.2d 1069 (Fla. 1979), cert. denied, 447 U.S. 912, 101 S.Ct. 3000, 64 L.Ed.2d 862 (1980); Hargrave v. State, 366 So.2d 1 (Fla. 1978), cert. denied, 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979); and Elledge v. State, 346 So.2d 998 (Fla. 1977).
The execution-style murders committed by the defendant have often led to an appropriately imposed sentence of death. In Sullivan v. State, 303 So.2d 632 (Fla. 1974), the defendant and an accomplice took the victim to a swampy area, intending to kill him. The defendant struck the victim twice with a tire iron, shot him in the back of the head with both barrels of a shotgun, reloaded and shot him again. This Court said, "The facts speak for themselves. This was an execution-type slaying. The sentence of death is appropriate and should be affirmed." Id. at 638.
In Gibson v. State, 351 So.2d 948 (Fla. 1977), cert. denied, 435 U.S. 1004, 98 S.Ct. 1660, 56 L.Ed.2d 93 (1978), the defendant and another man saw two sailors in a bar. They enlisted two women to entice the sailors to a late night rendezvous. The sailors were taken to a dark street and told to get out of the car and hand over their money. As one man got out of the car, offering his money and begging not to be shot, the defendant shot him twice in the head. The other sailor was also shot but did not die. Noting the absence of mitigating circumstances, this Court affirmed the sentence.
In another case the two victims had been shot in the head at close range. Again, in the absence of mitigating circumstances the death sentence was affirmed. Jackson v. State, 359 So.2d 1190 (Fla. 1978).
In our review capacity we must be able to ascertain whether the trial judge properly considered and weighed the above mitigating factors. Their existence would not as a matter of law, invalidate a death sentence, for a trial judge in exercising a reasoned judgment could find that a death sentence is appropriate. It is improper for us, in our review capacity, to make such a judgment.
The judgment of conviction is affirmed. The death sentence is vacated and the cause is remanded to the trial court for the purpose of determining an appropriate sentence. An additional sentence advisory verdict by a jury is not required.
ALDERMAN, C.J., and OVERTON and McDONALD, JJ., concur.
SUNDBERG, J., concurs in result only.
BOYD, J., concurs in part and dissents in part with an opinion.
BOYD, Justice, concurring in part and dissenting in part.
I concur in the affirmance of appellant's convictions which include six counts of premeditated *647 murder. I dissent to the court's judgment vacating the sentences of death. The trial court's findings of aggravating circumstances and the absence of mitigating circumstances were supported by the evidence and in accordance with the law. We should affirm the sentences of death.