[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-15422
_____

D.C. Docket No. 1:12-cv-23817-DTKH

JOHN FERGUSON,

Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 21, 2013)

Before CARNES, WILSON and PRYOR, Circuit Judges.

CARNES, Circuit Judge:

The Supreme Court has decided that a convicted murderer cannot be

executed unless he has a rational understanding of the fact that he is going to be

put to death and of the reason for his execution. Panetti v. Quarterman, 551 U.S.

930, 954–60, 127 S.Ct. 2842, 2859–62 (2007). In announcing that rule, however,

the Court did not decide what rational understanding means in this context. It acknowledged that "a concept like rational understanding is difficult to define" and cautioned that "normal" or "rational" in this context does not mean what a layperson understands those terms to mean. Id. at 959–60, 127 S.Ct. at 2862. The Court did reject the standard the court of appeals had applied in the Panetti case because that standard disregarded or did not give sufficient consideration to evidence of "psychological dysfunction" and "delusional beliefs." Id. at 960, 127 S.Ct. at 2862. But the Court emphasized that it deliberately was not being more specific and cautioned that it was "not attempt[ing] to set down a rule governing all competency determinations." Id. at 960–61, 127 S.Ct. at 2862. "[W]e find it difficult," the Court confessed, "to amplify our conclusions or to make them more precise." Id. at 961, 127 S.Ct. at 2863.

The bottom line of the Panetti decision is that there is not yet a well-defined bottom line in this area of the law. Instead of attempting to answer more specifically the question of what is required for a rational understanding of death by execution and the reason for it, the Supreme Court preferred to leave "a question of this complexity" to be addressed in a fuller manner and on a better record by the district court and the court of appeals in that case. Id. The decision not to decide more is, unfortunately, the last word from the Supreme Court on the

2

"question of this complexity," one variation of which is presented by the facts in our case.

The habeas petitioner in our case, John Ferguson, contends that under the Panetti decision he is mentally incompetent to be executed. As the facts come to us, Ferguson has a mental illness but he does understand that he is going to die by execution, and he understands that it is going to happen because he committed eight murders. Ferguson also believes, as tens of millions if not hundreds of millions of other people do, that there is life after death. Countless people also believe, as he does, that they are among God's chosen people. But Ferguson's religious belief is more grandiose than that because he believes that he is the Prince of God. The Florida courts rejected Ferguson's Panetti claim, and we must decide whether their decision to do so "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" or was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). The key words being "clearly established law." Or the lack of it.

## I. BACKGROUND

### A. The Crimes

Part of the analysis of Ferguson's mental competency to be executed involves his understanding of the connection between his execution and the crimes

3

for which he is going to be executed, which makes the nature of those crimes relevant.

## 1.  The Carol City Murders

On the night of July 27, 1977, Ferguson, posing as a Florida Power and Light employee who needed to check some electrical outlets, persuaded Miss Margaret Wooden to let him enter her home.  Ferguson v. State, 417 So. 2d 639, 640, 643 (Fla. 1982).  After pretending to check the outlets in several rooms, Ferguson drew a gun on Wooden and bound and blindfolded her.  Id. at 640.  He then let two of his criminal cohorts into the house so that they could search it for drugs and valuables.  Id.  About two hours later the owner of the house and five of his friends arrived.  Id.  Wielding guns, Ferguson and his accomplices bound and blindfolded and searched the six men.  Shortly thereafter, Wooden's boyfriend, Michael Miller, arrived.  He, too, was bound and blindfolded and searched at gunpoint.  Id.  While six of the robbery victims were forced to kneel in the living room, Miller and Wooden were taken into her bedroom.  Id.  There they were put with their knees on the floor and their upper bodies lying across the bed.  Id. at 641.

Then the killing began.  Ferguson and his partners in crime methodically murdered five of the six men who were kneeling in the living room by shooting each one in the back of the head while their hands were tied behind them.  Id. at

4

641.  One of the six men somehow survived the shot to the back of his head, living to tell about the methodical murders of the other men in the living room. Id.

While Miller and Wooden were kneeling in the bedroom, Wooden heard the gunshots in the living room.  Id.  She saw her boyfriend shot to death beside her. Id.  She saw a pillow coming toward her before she was shot in the head.  Id.  And she heard Ferguson running out of the bedroom after the shootings.  Id.  Despite her head wound, Wooden managed to make it to a neighbor's house.  Id.  When the police arrived at Wooden's house, they found six dead victims, all of whom had been shot in the back of the head while their hands were bound behind their backs, and they found the two intended murder victims who had been shot in that same manner but had somehow survived.  Id.

### 2. The Hialeah Murders

Ferguson had two accomplices when he committed the six Carol City murders, but less than six months later he committed two more murders all by himself.  Ferguson v. State, 417 So. 2d 631, 633 (Fla. 1982).  On the evening of January 8, 1978, Brian Glenfeld and Belinda Worley, both of whom were seventeen years old, left a Youth for Christ meeting in Hialeah.  Id.  They were supposed to meet some friends at a local ice cream parlor, but they never arrived. Id.  Apparently on the way to meeting their friends, the young couple pulled off the

road.  See id. at 636.  What Ferguson did to the two teenagers when he chanced

upon them was recounted by the trial court judge:

> The facts reveal that the two victims were seated in an automobile and
> while seated therein a gunshot was fired through the window striking
> Brian Glenfeld in the arm and chest area.  A significant amount of
> bleeding followed and this victim's blood was found throughout many
> areas of the front of the automobile as well as on the clothing of
> Belinda Worley.  Following the shooting, the female victim ran many
> hundreds of feet from the car in an attempt to [elude] the defendant
> and was finally overtaken in some rather dense overgrowth and trees.
> She was subjected to many physical abuses by this defendant,
> including but not limited to, sexual penetration of her vagina and
> anus.  The discovery of embedded dirt in her fingers, on her torso both
> front and back and in many areas within her mouth and the findings of
> hemorrhaging around her vagina and anal cavity would indicate that
> she put up a significant struggle and suffered substantially during the
> perpetration of these indignities upon her body.  Expert testimony
> indicates that she was a virgin at the time of the occur[r]ence of this
> crime.  The position of her body and the location of the wounds on her
> head would indicate that she was in a kneeling position at the time she
> was shot through the top of the head. She was left in a partially nude
> condition in the area where the crime was committed to be thereafter
> fed upon by insects and other predators.  Physical evidence would
> substantiate that following the attack upon Belinda Worley the
> defendant went back to the car and shot Brian Glenfeld through the
> head.

Id.  Ferguson stole cash from Brian Glenfeld's wallet.  Id. at 633.  Among the

items he took from Belinda Worley, or her body, were two rings, a gold bracelet,

and a pair of earrings. Id.  When he ripped one of those earrings from Worley's

ear, he tore her ear lobe.  Id.

6

To murder the two young victims Ferguson used a .357 magnum pistol that had been stolen from a victim of the Carol City murders nearly six months earlier. Id.  He confessed to killing the "two kids." Id.

### B. The Trials, Appeals, and Collateral Attacks

Following separate trials, Ferguson was convicted of murdering the six Carol City victims and the two Hialeah victims.  See Ferguson v. Sec'y for Dep't of Corr., 580 F.3d 1183, 1190 (11th Cir. 2009).  The Florida Supreme Court affirmed all eight murder convictions on direct appeal, but remanded for resentencing due to the trial court's reliance on invalid aggravating factors and its failure to properly consider certain mitigating factors.  Ferguson v. State, 417 So. 2d 639 (Fla. 1982); Ferguson v. State, 417 So. 2d 631 (Fla. 1982).  On remand, the trial court reimposed the death penalty in each case and the Florida Supreme Court affirmed in a consolidated appeal.  Ferguson v. State, 474 So. 2d 208 (Fla. 1985).

Ferguson filed a motion under Florida Rule of Criminal Procedure 3.850 seeking relief from his convictions and sentences, but that motion was denied and the denial was affirmed on appeal.  Ferguson v. State, 593 So. 2d 508 (Fla. 1992).  He filed a federal habeas petition attacking his convictions and sentences, but it too was denied, and the denial was affirmed on appeal.  Ferguson, 580 F.3d at 1222.

### C. Ferguson's Mental Health History and the Pre-2000 State Court Mental Competency Hearings

7

Throughout the first half of the 1970s, Ferguson was consistently diagnosed by mental health professionals with paranoid schizophrenia, which resulted in commitments to a state psychiatric facility and a prescribed regimen of potent antipsychotic medications.  In 1976 he was deemed mentally competent and discharged from a mental hospital.

In the three and a half decades since that discharge Ferguson's attorneys have exhaustively litigated his mental competency.  Although experts have differed in their opinions about his mental state during that time, every state and federal court to decide the issue has decided that Ferguson is not mentally incompetent. Earlier determinations of competency, whether addressed to a prisoner's responsibility for committing a crime or to his ability to stand trial, "do not foreclose a prisoner from proving he is incompetent to be executed because of his present mental condition." Panetti, 551 U.S. at 934, 127 S.Ct. at 2848.  Still, the history of Ferguson's mental condition, the opinions of experts regarding it, and judicial decisions about it over the years are all relevant to a discussion of his present mental condition.

In connection with his two 1978 murder trials, the state court held separate hearings, one before each trial, to determine whether Ferguson was competent to stand trial.  See Ferguson v. Singletary, 632 So. 2d 53, 58 (Fla. 1994).  Four court-appointed experts filed reports before the Carol City trial (the one with eight

8

shooting victims), unanimously concluding that Ferguson was mentally competent. See id. Some of the four experts were even of the opinion that Ferguson was malingering and not actually schizophrenic, but instead likely was sociopathic. See Ferguson, 593 So. 2d at 510. Notably, two of those four court-appointed experts, Drs. Charles Mutter and Albert Jaslow, receded from the diagnoses that they had reached in the early to mid-1970s that Ferguson was actively psychotic. Based on the four experts' opinions, the trial court found Ferguson mentally competent to stand trial. See Ferguson, 417 So. 2d at 645.

Following his convictions in the Carol City trial, Ferguson obtained several mental health experts and entered a plea of not guilty by reason of insanity in the Hialeah trial (the one with two murder victims). See Ferguson, 417 So. 2d at 637. The trial court held a pretrial competency hearing and considered conflicting testimony from at least seven expert witnesses, three of whom had also filed reports in connection with the earlier murder trial. See id. The experts were, by and large, evenly split on the question of Ferguson's competency to stand trial: three found Ferguson incompetent while another three found him competent. Although it is unclear from the record what the seventh expert concluded, it is clear that the trial court again found that Ferguson was competent to stand trial. See id. The Florida Supreme Court affirmed, concluding that there was adequate medical

9

testimony to support the trial judge's finding that Ferguson was mentally competent to stand trial. Id. at 634.

When Ferguson filed his initial state post-conviction motion in 1987, he also filed a motion to stay the proceedings based on his alleged incompetence to assist counsel. See Ferguson v. State, 789 So. 2d 306, 308 (Fla. 2001). The trial court appointed three experts to assess Ferguson's mental health at the time, ordered numerous neurological examinations, and held a three-day evidentiary hearing in August 1998, at which a total of six expert witnesses testified on the issue of mental competence. Id. at 313–14. While the experts offered conflicting testimony about the genuineness and severity of Ferguson's psychological symptoms, the trial court found that the credible evidence demonstrated that Ferguson did not suffer from a major mental disorder, found that he was malingering, and found that he was mentally competent to understand the proceedings and assist his counsel. See id. at 313–15. The Florida Supreme Court upheld the trial court's findings and determination on those issues, concluding that they were adequately supported by the evidence presented at the hearing. Id. at 315.

### D. The First Federal Habeas Proceeding

In March of 1995 Ferguson filed his first federal habeas petition, which raised numerous constitutional claims about various aspects of his trial, sentencing,

and state post-conviction proceedings, including a claim that his due process rights had been violated because the state post-conviction proceedings were conducted while he was mentally incompetent. See Ferguson, 580 F.3d at 1192–93, 1220. He also filed a motion to stay the federal habeas proceedings on the ground that he was mentally incompetent to proceed with it.

In December 2004, the district court held a five-day evidentiary hearing on the motion to stay the habeas proceedings at which it heard conflicting testimony from six expert witnesses about Ferguson's mental state at that time. See id. at 1192, 1221–22. After considering the evidence, the district court denied the motion to stay because it found that Ferguson was mentally competent to proceed with the habeas proceeding. See id. at 1192, 1221–22. On appeal, we summarized the district court's findings on the issue:

> After holding a competency hearing, the district court found that there was credible evidence to show that Ferguson at one time suffered from a mental disorder that had symptoms associated with paranoid schizophrenia and that, since 1994, his mental health has improved so as to make him "no longer a disruptive member of his prison environment." R4-107 at 15. It also found that his disorder was in remission and that he was malingering or exaggerating his symptoms. See id. The court further found that Ferguson had the "mental competency, clarity of thought, directness of speech, and motivation to advance his interests and objectives when faced with a variety of adverse circumstances." Id. at 15, 17. The court made a number of other factual findings including that the totality of his test results supported the conclusion that he was "consciously reporting symptoms of mental illness that he [was] not presently experiencing"

11

and that his unwillingness to cooperate with his counsel was based on a desire to avoid punishment. Id. at 17, 20. Based on all of this, the court concluded that Ferguson "ha[d] sufficient present ability to consult with counsel with a reasonable degree of rational understanding-and ha[d] a rational as well as factual understanding of the proceedings against him." Id. at 21-23.

Id. at 1221–22. We found ample evidence to support all of the district court's findings on the competency issue. Id. at 1222. Assuming that a petitioner had a right to have his federal habeas proceeding stayed during a period of mental incompetency, we held that the district court had not erred in denying Ferguson a stay.[1] Id.

We also affirmed the district court's denial of all of Ferguson's constitutional claims, including his claim that the state post-conviction court had violated his due process rights by adjudicating his claims while he was mentally incompetent to proceed. As to that claim, we explained that: "After carefully examining the record from the [state collateral court's] competency hearing, we find that the evidence fairly supported the finding that Ferguson was competent to proceed with his 3.850 claim." Id. at 1221.

E. The 2012 State Commission Competency Proceedings

---

[1] The Supreme Court later held that federal habeas petitioners have no right to stay the adjudication of their petitions on grounds of mental incompetence. Ryan v. Gonzales, — U.S. —, 133 S.Ct. 696, 700 (2013).

On September 5, 2012, the Governor of Florida signed a warrant for Ferguson's execution and prison officials scheduled the execution for October 16, 2012.  Ferguson requested a hearing on his competency to be executed, and, as required by Fla. Stat. § 922.07, the Governor temporarily stayed the execution and appointed a commission of three psychiatrists.  Drs. Wade Myers, Alan Waldman, and Tonia Werner, were to determine whether Ferguson "understands the nature and effect of the death penalty and why it is to be imposed upon him."  The Governor directed the commission to conduct its evaluation on October 1, 2012, and submit a written report by the following day.

As instructed, the commissioners met on October 1, 2012, jointly interviewed Ferguson for roughly 90 minutes, reviewed his mental health records from 1978 to the present, and interviewed three correctional officers who had regular contact with Ferguson over the years.  The commissioners issued their report later that same day, finding that Ferguson "understands the nature and effect of the death penalty and why it was imposed on him," and finding that he was not then suffering from mental illness.  In support of its findings, the commission noted that Ferguson's mental health records showed that, while he was once diagnosed with paranoid schizophrenia, he had been free of signs and symptoms of mental illness for a number of years, had not been treated with antipsychotic medications since 2000, and since August 2001 had been classified as an S-1

13

inmate, which is a psychiatric grade given to state prisoners who have no identifiable mental health problems impairing their functioning in the prison setting.

The commission's report further noted that, during the interview, Ferguson was calm, cooperative, and responsive; he exhibited average intelligence; he denied any cognitive disturbances; and he demonstrated linear and goal-directed thought processes. While Ferguson told the commissioners that he had been anointed the "Prince of God" and would arise following his death to be at the "right hand of God," the commissioners concluded that even if these were genuine delusions, they did not affect Ferguson's "factual and rational understanding of his impending execution." The report specifically mentioned that Ferguson acknowledged that he was going to be executed because of the murders he had committed and acknowledged that he would die as a result of the execution. Finally, the report recounted that the three correctional officers, who had known Ferguson for a period of time ranging from nine months to ten years, all described him as polite and rational, and none of them had observed any abnormalities in his thinking, communication, or behavior.

After receiving the competency commission's report, the Governor determined that Ferguson had the mental capacity to understand both the nature of the death penalty that was to be inflicted on him and the reasons it would be, and

14

on that basis the Governor lifted the stay of execution.  On October 3, 2012, Ferguson petitioned the state trial court to review the Governor's competency determination, contending that executing him would violate the Eighth Amendment, as interpreted in Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595 (1986), and Panetti, 511 U.S. 930, 127 S.Ct. 2842, because he lacked a rational understanding of the reasons for, and the consequences of, the punishment. Ferguson also argued that Florida's existing standard for assessing competency to be executed, codified in Florida Rules of Criminal Procedure 3.811(b) and 3.812(b), was inconsistent with the standard announced in Panetti.

### F. The 2012 State Court Evidentiary Hearing

On October 8, 2012, the trial court issued a stay of execution.  Thereafter, the court held a two-day evidentiary hearing.  During that hearing Ferguson presented the testimony of two expert witnesses, Drs. George Woods and Richard Rogers, as well as the testimony of one of his attorneys, Patricia Brannan, who had been present during the competency commission's evaluation of Ferguson.  The State, in turn, called three expert witnesses, Drs. Wade Myers, Tonia Werner, and Enrique Suarez; five prison officials who had recent contact with Ferguson; and Jennifer Sagle, a mental health counselor who had worked on death row until July 2012.

### 3. Ferguson's Witnesses

15

i. Dr. Woods

Dr. George Woods, a psychiatric expert who has testified throughout the country on behalf of capital inmates, reviewed Ferguson's mental health records, interviewed him on three separate occasions from October 2011 to September 2012, and administered several neurological tests. He prepared a written report on Ferguson's behalf, which was admitted into evidence during the evidentiary hearing. In his report, Dr. Woods recounted Ferguson's documented history of paranoid schizophrenia, including his belief that he is the "Prince of God." The report stated that Ferguson exhibited delusional beliefs and reported experiencing visual, auditory, and olfactory hallucinations throughout the years. According to Dr. Woods' report, Ferguson said that his long-deceased father was still alive and protecting him, that he is the Prince of God, that he will be resurrected at some point after his execution "to sit at the right hand of God," and that he is destined to ascend to his rightful throne and ultimately "save the world." Ferguson also told Dr. Woods about visual and auditory hallucinations of seeing and communicating with his dead father, as well as olfactory hallucinations of an inexplicable "sweet smell." Ferguson recounted earlier experiences of seeing snakes and vicious dogs coming out of the walls of his cell, although he acknowledged that his visual and auditory hallucinations had diminished over the past decade.

16

Dr. Woods' report concluded that, although Ferguson understands that he is facing execution and that the State of Florida intends to execute him for the crimes for which he was convicted, he lacks a rational understanding of the reason for the execution and its consequences. The report said that Ferguson believes his convictions and continued incarceration on death row are "not based upon the law," but are part of a plot by the State of Florida "to prevent him from ascending to his rightful throne as the Prince of God," as well as a "conspiracy of corrupt policemen" to retaliate against him "for being acquitted in a prior case." The report said that Ferguson believes he will not die as a result of his execution due to "his father's powers" and his eventual resurrection.

In his hearing testimony, Dr. Woods reiterated his opinion that Ferguson is a paranoid schizophrenic and lacks a rational understanding of the reason for his execution and its consequences. He testified that Ferguson has grandiose delusions that he is the Prince of God, that there is a Communist plot to take over the United States, that he will play a divine role in driving away the Communist threat, and that the State cannot kill him because he possesses "special powers." Dr. Woods also recounted Ferguson's reports of visual hallucinations of seeing "shadow people" since a very young age, auditory hallucinations of hearing the voice of his dead father, and olfactory hallucinations of a "sweet smell" that would persist even after he cleaned his cell. In contrast to his written report, however, Dr. Woods

17

testified at the evidentiary hearing that Ferguson believes that, through his trial and incarceration, the State of Florida has been preparing him for his "ascension" to his rightful throne as the Prince of God, not preventing him from doing so. And, also unlike his report, Dr. Woods did not testify that Ferguson believed that his convictions, incarceration, and impending execution were the product of a conspiracy among state officials or were the result of anything other than the murders he had committed.

In his testimony, Dr. Woods conceded that Ferguson had not taken any antipsychotic drugs since 2000, had not exhibited any unusual behaviors to prison staff since that time, and since 2001 had maintained an S-1 classification (the designation for prisoners with no identifiable mental health concerns that might impair their functioning in prison). He also conceded that Ferguson had filed a number of prison grievances over the years that were "fairly goal-directed toward his daily life" and made no reference at all to believing that he is the Prince of God. Dr. Woods described Ferguson as a "geriatric" or "late-life" schizophrenic who, despite his psychosis, did not necessarily require medication and would not necessarily exhibit any outward manifestations of his illness because the "positive symptoms" of paranoid schizophrenia diminish with age. He stated that paranoid schizophrenics are the highest functioning types of schizophrenics and can perform ordinary tasks in structured environments.

18

In further support of his diagnosis, Dr. Woods opined that Ferguson suffers from cavum septum pellucidum, a fissure between the two hemispheres of the brain indicative of schizophrenia. Although Dr. Woods initially testified that the fissure was "very deep," he later retreated from that description, conceding on cross-examination that the 2004 radiology report upon which he had relied actually stated that Ferguson's brain was intact except for a "very small" cavum septum pellucidum. Dr. Woods also conceded that a 2001 article from the American Journal of Psychiatry concluded that a small cavum septum pellucidum is a normal anatomical variant that appears in virtually equal numbers of schizophrenic and non-schizophrenic people.

### ii. Dr. Rogers

Dr. Richard Rogers, an expert in forensic psychology and malingering, also testified as an expert witness for Ferguson. He evaluated Ferguson on September 20 and 21, 2012, for the limited purpose of determining whether he was currently malingering or feigning psychotic symptoms. In addition to interviewing Ferguson, Dr. Rogers administered a battery of malingering tests. He acknowledged that two of the test scores were elevated and did suggest that Ferguson was malingering. However, based on the totality of the results of the administered tests, Dr. Rogers was of the opinion that Ferguson was not currently malingering, even if he had done so in the past. On the core question of mental

19

competency, however, Dr. Rogers conceded that Ferguson did not exhibit any obvious signs of cognitive impairment in his writings or verbal communications, and appeared to be of average intelligence.

### 2. The State's Witnesses

At the evidentiary hearing, the State first presented the testimony of two of the psychiatrists who had served on the Governor's competency commission, Drs. Myers and Werner.

### i. Dr. Myers

Dr. Wade Myers, a board certified psychiatrist and professor of psychiatry at Brown University, testified that he had evaluated and diagnosed thousands of schizophrenic people during his professional career. Dr. Myers described how he and his fellow commissioners had conducted their competency evaluation of Ferguson. They began by reviewing two file boxes of medical, psychiatric, and correctional records dating back to 1978. Each of the three commissioners had taken a portion of the records, reviewed them for information about Ferguson's mental health, and then discussed with the other two commissioners the records they found significant. Among other things, the records established that Ferguson had been classified as an S-1 inmate since 2001, he had not taken any psychotropic

20

medications since 2000, and his prison mental-health evaluations did not indicate he had shown any symptoms of mental illness since at least 2001.

Dr. Myers testified that, after reviewing the medical records for 90 minutes, the commission interviewed Ferguson for an additional 90 minutes in the presence of attorneys from both sides. During the interview, Ferguson was polite, calm, cooperative, and did not exhibit any signs of distress or of any thought disorder. Ferguson informed the commissioners that he was not taking any psychiatric medications, did not feel like he needed psychiatric treatment, and told them that he did not suffer from any mental problems. When one of the commissioners, Dr. Waldman, mentioned that Ferguson had been convicted of six homicides, Ferguson corrected him and said that it was eight.

Dr. Myers further testified that Ferguson discussed his religious beliefs, stating that he was a Christian, believed in God, read the Bible regularly, and liked to visit the prison chaplain. Ferguson said that he hears the voice of God with his "inner ears," but only when he prays. Ferguson also informed the commissioners that he was anointed the "Prince of God" many years ago, and that he would be resurrected following his execution to sit "at the right hand of God." According to Dr. Myers, Ferguson only mentioned two current hallucinations: seeing dark shadow people, which no longer bothered him, and experiencing an inexplicable "sweet smell," which he actually enjoyed. Ferguson told them that, in the distant

21

past, he had witnessed vicious dogs coming out of his cell walls and "snakes coming out of his leg," though those particular hallucinations had stopped decades ago.

Dr. Myers also testified that, following their interview of Ferguson, the commissioners interviewed three correctional officers who had daily interactions with Ferguson for time periods ranging from almost a year to nine years. Those officers reported that Ferguson communicated normally, was coherent, and never exhibited any bizarre behavior.

After reviewing some additional records and conferring with one another, the three commissioners unanimously concluded that Ferguson had the mental capacity to understand the nature and effect of the death penalty and the reason it was being imposed on him. Dr. Myers explained that, although he and Dr. Waldman brought a number of psychological tests to the evaluation, the commission members found no reason to administer the tests given the lack of evidence that Ferguson suffered from any significant mental illness. Dr. Myers emphasized that Ferguson displayed lucid thinking and average intelligence throughout the interview, that the correctional records showed that he was functioning well in his day-to-day life, and that the correctional officers interviewed by the commission had witnessed no bizarre behaviors by him. Dr. Myers also testified that he believed that Ferguson was fabricating his reported

22

delusions and, even if they were genuine, he would still not meet the diagnostic criteria for schizophrenia because the delusions were not disrupting his daily life. Dr. Myers testified that Ferguson had a "rational understanding of the nature of the death penalty and the reason it is to be inflicted upon him."

### ii. Dr. Werner

Dr. Tonia Werner, a board certified psychiatrist and professor of forensic psychiatry at the University of Florida, who had served as one of the competency commissioners, also testified at the evidentiary hearing. She corroborated Dr. Myers' account of the commission's evaluation process and agreed with his opinion that Ferguson does possess a rational understanding of the fact of his impending execution and of the reason for it. Dr. Werner confirmed that Ferguson informed the commissioners that he had been anointed the Prince of God, would be resurrected after his death to "sit at the right hand of God," and would eventually return to Earth. She testified, however, that Ferguson had indicated that he was going to be executed and stated that he would be the first state inmate to receive Florida's new lethal-injection protocol. She recounted that Dr. Waldman had specifically asked Ferguson whether he would physically die and be buried after his execution, and Ferguson answered that he would.

23

Finally, Dr. Werner testified that she did not believe that Ferguson was currently suffering from a major mental illness because his reported hallucinations, particularly those of seeing shadow people, were inconsistent with schizophrenia, and there were no signs of dysfunction in his daily activities. She explained that, even if Ferguson were suffering from mental illness, he did not demonstrate any difficulties in his mental capacity or cognition that would suggest that he did not fully understand the reasons for and the consequences of his impending execution.

### iii. Dr. Suarez

Dr. Enrique Suarez, a neuropsychologist, also testified for the State at the evidentiary hearing. He had examined Ferguson in 2004 during the federal habeas proceedings and had concluded that Ferguson was not exhibiting any behavioral symptoms of psychosis and was malingering. Dr. Suarez testified that he had reviewed Ferguson's records from the 2004 proceeding and from that time to the present, had reviewed the reports of Ferguson's expert witnesses, and had listened to the testimony of all of the experts who had testified at the present hearing (he was the last expert witness to testify before Dr. Woods was recalled as a rebuttal witness). After considering all of those records and testimony, Dr. Suarez was still of the opinion that Ferguson was not schizophrenic.

Dr. Suarez emphasized that it was highly unlikely for a schizophrenic not to suffer a relapse after being unmedicated for more than a decade, and that

24

Ferguson's various inmate requests and prison grievances showed "no bleed-through" of his professed delusions and hallucinations. He specifically identified an inmate request form dated July 25, 2011, in which Ferguson requested 256 pages of legal materials for a pro se appeal that he was pursuing. According to Dr. Suarez, the request was perfectly coherent, "[q]uite sophisticated," and demonstrated that "delusional contamination" did not hinder Ferguson from being "able to work through the system that's set up to get his needs met."

### iv. Prison Officials and Employees

The State also called as witnesses a number of prison officials who had regular contact with Ferguson around the time his death warrant was signed on September 5, 2012. They uniformly testified that Ferguson did not exhibit any abnormal behaviors or make any unusual requests that suggested he was mentally unstable. Officer Jay Taylor, who spoke to Ferguson on the day his death warrant was signed, testified that Ferguson stated that he had not had an execution warrant signed on him in 35 years.

Brad Whitehead, the assistant warden at Florida State Prison, testified that he spoke to Ferguson about his wishes for a last meal, the disposition of his remains, and who should be contacted. Ferguson provided Whitehead with the names of his mother, his attorneys' law firm, and his spiritual advisor, and he also expressed concern about his mother's wellbeing due to her medical conditions.

25

When asked what he wanted done with his remains after his execution, Ferguson responded that he needed to consult with his attorneys about that.  At no point did he indicate or imply that he was unconcerned about the disposition of his remains because his status as the Prince of God would render that matter moot.

Jennifer Sagle, a mental health counselor who worked on death row from December 2005 until July 2012, testified that during the time she worked there Ferguson maintained an S-1 psychiatric classification, the lowest level recognized by the Florida Department of Corrections.  Sagle further testified that she never received any complaints or referrals from other inmates or prison guards regarding Ferguson's mental health, and that she had not personally observed any unusual behavior or symptoms of schizophrenia during her weekly rounds.  Although Sagle acknowledged that paranoid schizophrenics might not outwardly manifest "positive symptoms" of their disease, such as hallucinations, she testified that they would exhibit "negative symptoms" such as a flattened affect and lack of motivation, which Ferguson had not shown.

### 4. Ferguson's Rebuttal Witnesses

Ferguson called two witnesses in rebuttal.  The first was Patricia Brannan, one of his attorneys who had attended the evaluation by the mental competency commission.  She testified that Ferguson was calm, placid, focused, and cooperative while the commissioners interviewed him, though he became agitated

26

a few times in response to particular questions.  She indicated that, contrary to Dr. Myer's testimony, it was one of the commissioners who had corrected the misstatement that Ferguson had been convicted of six murders.  She further stated that, when asked about his impending execution, Ferguson responded "they're gonna kill me, like Jesus" and that "God told me lethal injection, and they have some new stuff just for me."  Moreover, when asked by a commissioner about what would happen after he was buried, Ferguson responded that he would ascend to "sit at the right hand of God" and would eventually return to his "rightful place in the world."

Dr. Woods was the other rebuttal witness.  He testified that the relapse rate for geriatric (or late life) schizophrenics is only about four percent even among those not taking antipsychotic medication. He also stated that the fact that Ferguson had not exhibited any symptoms to prison officials and employees after being off medication for more than a decade was not inconsistent with his diagnosis of late life schizophrenia.  He stuck to his diagnosis of Ferguson and the opinion that he was not mentally competent to be executed.

5. The 2012 State Trial Court Decision on Ferguson's Competency

After the evidentiary hearing on the competency issue, the state trial court issued an order finding that Ferguson had failed to meet his burden of proving that he was mentally incompetent to be executed.  State v. Ferguson, No. 04-2012-CA-

27

507, op. at 1, 17 (Fla. Cir. Ct. Oct. 12, 2012). The court, partially crediting the testimony of Dr. Woods and Dr. Rogers "as it relates to Ferguson's documented history of paranoid schizophrenia," found that Ferguson suffers from paranoid schizophrenia, that there was not "sufficient evidence [he was] malingering during the interview with the Commission," and that he harbors a genuine delusional belief that he is the Prince of God. Id. at 17. However, the court specifically found "the testimony and opinions of Dr. Myers and Dr. Werner to be credible as to the limited question of Ferguson's competency to be executed" and found their testimony on those issues to be supported by both the record and the testimony of the prison officials and employees. Id. at 17–18.

The court concluded that, although Ferguson suffers from paranoid schizophrenia, "there is no evidence that he does not understand what is taking place and why it is taking place" or that his "mental illness interferes, in any way, with his 'rational understanding' of the fact of his pending execution and the reason for it." Id. at 18. In support of its conclusion, the court emphasized that "Ferguson is aware that the State is executing him for the murders he committed and that he will physically die as a result of the execution," and that "[t]here is no evidence that in his current mental state Ferguson believes himself unable to die or that he is being executed for any reason other than the murders he was convicted of in 1978." Id. The court also remarked that, "[i]n some sense, Ferguson appears to

28

have fit his grandiose [Prince-of-God] delusion into a traditional religious worldview" and that his "belief as to his role in the world and what may happen to him in the afterlife is [not] so significantly different from beliefs other Christians may hold so as to consider it a sign of insanity." Id.

The state trial court rejected Ferguson's contention that Panetti displaced or added anything to the existing state standard for assessing mental competency to be executed, which asks whether a prisoner "lacks the mental capacity to understand the fact of the impending execution and the reason for it." Id. at 4. The court noted that, in Provenzano v. State, 760 So. 2d 137 (Fla. 2000), which was decided before Panetti, the Florida Supreme Court had "considered the difficulties of persons who have mental illnesses and delusions" and held that they could still be found mentally competent to be executed if they possessed "a factual and rational understanding" of their execution and the reasons for it. Id. at 4–5.

6. The 2012 Florida Supreme Court Decision on Ferguson's Competency

Ferguson appealed that decision to the Florida Supreme Court, contending that the state trial court had failed to apply the mental competency standard announced in Panetti and that the Florida Supreme Court's Provenzano decision was no longer good law. He contended in the alternative that, even if the trial court had applied the correct legal standard, its finding that he was mentally competent to be executed was not supported by the record, particularly given the

29

subsidiary findings that he is a paranoid schizophrenic who believes that he is the Prince of God. Ferguson also claimed that he had not been afforded a full and fair evidentiary hearing before the state trial court, in contravention of his due process rights.

The Florida Supreme Court affirmed the trial court's decision. It found that there was "competent, substantial evidence" to support the trial court's finding that Ferguson's mental illness and Prince-of-God delusion did not interfere with his "rational understanding" of the fact of his pending execution and the reason for it, and that the record supported the finding that he "understands what is taking place and why." Ferguson v. State, No. SC12-2115, op. at 4, 7 (Fla. Oct. 17, 2012). The Court did not adopt the state trial court's view that Ferguson's delusions were a grandiose manifestation of otherwise normal Christian beliefs. It stated that "[w]hether Ferguson's convictions are representative of mainstream Christian principles or delusions that derive from his mental illness does not affect our inquiry." Id. at 4. Either way, he understood that he was going to be executed and why. The Florida Supreme Court also rejected Ferguson's contention that Panetti imposed a stricter standard for mental competency to be executed than the one it had adopted in its Provenzano decision. Id. at 6–8. In doing so, the Court acknowledged Panetti's statement that a "prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it," but

30

explained that Panetti was a "narrowly tailored decision" and that Provenzano itself had required that a prisoner "understand the connection between his crime and the punishment he is to receive for it." Id. at 7–8.

## G. This Federal Habeas Proceeding

On October 19, 2012, Ferguson filed a federal habeas petition under 28 U.S.C. § 2254, along with an emergency motion for a stay of execution until there was a ruling on the merits of that petition. His petition claimed that he is mentally incompetent to be executed under the Eighth Amendment, as interpreted in Ford and Panetti, because he lacks a rational understanding of the consequences of, and reasons for, his impending execution. Ferguson contended that the decisions of the state courts were contrary to clearly established federal law because they relied on the factual-awareness standard rejected by Panetti and were otherwise based on an unreasonable determination of the facts in light of the evidence presented.

On October 20, 2012, the district court granted a temporary stay of execution to permit a "fair hearing" on Ferguson's habeas claim. Two days later we granted the State's emergency motion to vacate that stay of execution, concluding that the district court had applied the wrong legal standard for granting a stay and that Ferguson had failed to demonstrate that he had a substantial likelihood of success on the merits of his claim. We specifically determined that

31

Ferguson did not show that the Florida Supreme Court either unreasonably applied clearly established federal law or made an unreasonable determination of the facts when it found him competent to be executed.

Thereafter, and less than an hour before Ferguson's scheduled execution on October 23, 2012, the district court issued a summary order denying the habeas petition, but granting Ferguson a certificate of appealability (COA) on the following issues:

> A. Whether the decision of the Florida Supreme Court involved an unreasonable application of the Un[ited] States Supreme Court's decision[s] in Ford and Panetti.
>
> B. Whether the Florida Supreme Court's affirmance of the state trial court was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, viz, that (a) the petitioner has a documented history of paranoid schizophrenia[,] (b) he is not malingering, and (c) he has a fixed grandiose delusion that he is the "Prince of God."

We granted a temporary stay of execution under Eleventh Circuit Rule 22-4(a)(7). The State moved to vacate the stay of execution and dismiss Ferguson's appeal on the ground that the district court had improperly granted a COA, particularly in light of our earlier determination that Ferguson did not have a substantial likelihood of success on the merits of his competency claim. We denied the State's motion to vacate the stay of execution.

## II. DISCUSSION

32

"We review de novo the denial of a petition for a writ of habeas corpus." Jamerson v. Sec'y for Dep't of Corr., 410 F.3d 682, 687 (11th Cir. 2005). The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) precludes federal courts from granting habeas relief on a claim already adjudicated on the merits in state court unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to" clearly established federal law if it applies a rule that contradicts the governing law set forth by the United States Supreme Court, or arrives at a result that differs from Supreme Court precedent when faced with materially indistinguishable facts. Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850 (2002). A state court decision involves an "unreasonable application" of clearly established federal law if "the state court correctly identifies the governing legal principle" from the relevant Supreme Court decisions "but unreasonably applies it to the facts of the particular case." Id. The key question is whether the state court's application of Supreme Court precedent is "objectively unreasonable," not simply whether a federal court "concludes in its independent judgment that the . . . state-court decision applied clearly established

33

federal law erroneously or incorrectly." Renico v. Lett, — U.S. —, 130 S.Ct. 1855, 1862 (2010) (quotation marks omitted).

As the Supreme Court has explained, there is a critical difference between the question of whether to reverse for a claimed constitutional error on direct appeal and the question of whether to grant habeas relief after the state courts have rejected the claim of constitutional error. "Under AEDPA . . . it is a necessary premise that the two questions are different." Harrington v. Richter, — U.S. —, 131 S.Ct. 770, 785 (2011); see also Renico, 130 S.Ct. at 1862 ("This distinction creates 'a substantially higher threshold' for obtaining relief than de novo review."). The distinction between those two questions is critical to the proper functioning of the federal writ of habeas corpus in the post-AEDPA age. See Harrington, 131 S.Ct. at 780 (explaining that habeas "resources are diminished and misspent . . . and confidence in the writ and the law it vindicates undermined, if there is judicial disregard for the sound and established principles that inform its proper issuance").

The Supreme Court has not hesitated to reverse grants of habeas relief ordered by courts of appeals that ignore the distinction between direct appeal type de novo review and the more restrictive, highly deferential review mandated by 28 U.S.C. § 2254(d)(1). See, e.g., Felkner v. Jackson, — U.S. —, 131 S.Ct. 1305, 1307 (2011) (reversing a decision ordering habeas relief, which apparently had

34

applied the standard of review applicable on direct appeal instead of AEDPA's "highly deferential standard for evaluating state-court rulings"); Premo v. Moore, — U.S. —, 131 S.Ct. 733, 740 (2011) (reversing a decision ordering relief and cautioning that "[f]ederal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d)"); Harrington, 131 S.Ct. at 786 (reversing a decision ordering habeas relief based on a de novo review standard, and commenting that "[i]t bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable"); Smith v. Spisak, 558 U.S. 139, 149, 130 S.Ct. 676, 684 (2010) (reversing a decision ordering habeas relief because "[w]hatever the legal merits of the rule or the underlying verdict forms in this case were we to consider them on direct appeal, the jury instructions at Spisak's trial were not contrary to 'clearly established Federal law'").

The point, which the Supreme Court has repeatedly emphasized, is that AEDPA imposes a "highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico, 130 S.Ct. at 1862 (quotation marks omitted). "A state court's application of clearly established federal law or its determination of the facts is unreasonable only if no 'fairminded jurist' could agree with the state court's determination or conclusion." Holsey v. Warden, Ga. Diagnostic Prison, 694 F.3d 1230, 1257 (11th

35

Cir. 2012) (quoting Harrington, 131 S.Ct. at 786). To warrant federal habeas relief under the deferential standards prescribed by § 2254(d), a petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S.Ct. at 786–77.

## A.

Ferguson first argues that the Florida Supreme Court's decision involved an unreasonable application of clearly established federal law because, in adhering to the competency standard laid down in Provenzano, the court purportedly relied on the bare factual-awareness standard that the United States Supreme Court rejected in Panetti, instead of the applicable "rational understanding" inquiry.[2] Ferguson contends that in light of Panetti the competency standard announced by the Florida Supreme Court in Provenzano, which adopted the test articulated by Justice Powell in his concurring opinion in Ford, is constitutionally deficient because it merely asks whether a prisoner is aware of the punishment that will be imposed and the reason for imposing it.

---

[2] Technically speaking, Ferguson's contention that the Florida Supreme Court failed to apply the competency standard set forth in Panetti would, if believed, render the court's decision "contrary to" clearly established federal law, not merely an "unreasonable application" of Supreme Court precedent. See Bell, 535 U.S. at 694, 122 S.Ct. at 1850. Nonetheless, because the distinction does not impact our analysis or conclusions, we will address the issue in the terms set forth in the district court's COA and employed by Ferguson on appeal.

36

Our analysis of Ferguson's contention begins with a look at how the substantive standard for competency to be executed has evolved in both Florida and the United States Supreme Court.  Before the Supreme Court ever recognized a constitutional bar on executing the mentally incompetent, Florida had a statutory bar on putting to death an inmate who lacked the "mental capacity to understand the nature of the death penalty and the reasons why it was imposed upon him." Fla. Stat. Ann. § 922.07(2) (1985).  Later, in Ford, the Supreme Court held for the first time that the "Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane," 477 U.S. at 409–10, 106 S.Ct. at 2602, and it outlined procedural safeguards to enforce that constitutional prohibition, see id. at 411–17, 106 S.Ct. at 2602–06.  Justice Marshall's majority opinion in Ford did not, however, specify in any detail the substantive standard to be applied in assessing whether a prisoner is competent to be executed.  It did note that "we may seriously question the retributive value of executing a person who has no comprehension of why he has been singled out and stripped of his fundamental right to life," id. at 409, 106 S.Ct. at 2601, which seemed to imply a simple comprehension standard.

In his concurring opinion, however, Justice Powell articulated a more specific standard for competency, explaining that the "Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to

37

suffer and why they are to suffer it" and that it is constitutionally sufficient if "those who are executed know the fact of their impending execution and the reason for it." Id. at 422, 106 S.Ct. at 2608 (Powell, J., concurring). Justice Powell explained that "the retributive goal of the criminal law is satisfied" if a prisoner "perceives the connection between his crime and his punishment," and that a prisoner can "prepare himself for his passing" only if he is "aware that his death is approaching." Id. Justice Powell expressly found that Florida's statutory definition of competency to be executed was constitutionally adequate. Id. at 423, 106 S.Ct. at 2608.

While the Ford decision left Florida's competency standard standing, it did find fault with the procedures that were then in effect for determining whether that standard was met. Id. at 412–17, 106 S.Ct. at 2603–05. Thereafter, Florida adopted new procedures for assessing a prisoner's competency to be executed, which were codified in Florida Rules of Criminal Procedure 3.811 and 3.812. See In re Emergency Amendment to Florida Rules of Criminal Procedure (Rule 3.811, Competency to be Executed), 497 So. 2d 643 (Fla. 1986); Fla. R. Crim. P. 3.811; Fla. R. Crim. P. 3.812. Rule 3.811 also set forth a substantive competency standard, which was virtually identical to Florida's statutory definition, and which provided that "[a] person under sentence of death is insane for purposes of

38

execution if the person lacks the mental capacity to understand the fact of the impending execution and the reason for it." Fla. R. Crim. P. 3.811(b).

After the Ford decision, the Florida Supreme Court had occasion to elaborate on the meaning of the State's competency to be executed standard in two decisions involving the impending execution of Thomas Provenzano. In the first of those decisions, Provenzano v. State, 750 So. 2d 597, 602 (Fla. 1999) (Provenzano I), the Court rejected a claim that the standard articulated in Rule 3.811 was unconstitutional because it did not require a "rational appreciation of the connection between the crime and the punishment." The Court explained that the competency standard did, in fact, include a "rationality element" that required a prisoner to possess a "rational appreciation of the connection between his crime and the punishment he is to receive." Id. at 602–03. It then remanded the case for further proceedings to assess Provenzano's competency to be executed under that rational appreciation standard. Id. at 601–03.

When the case returned to it the following year, the Florida Supreme Court affirmed the trial court's determination that Provenzano, despite harboring a delusional belief that he was Jesus Christ, was competent to be executed because he had "a factual and rational understanding" that he had been sentenced to death for murdering a woman and that he would die when he was executed. Provenzano v. State, 760 So. 2d 137, 140 (Fla. 2000) (Provenzano II). The Court explained

39

that "Florida ha[d] adopted the Eighth Amendment standard announced by Justice Powell in Ford," and that Provenzano met this standard because he possessed "the mental capacity to understand the fact of his pending execution and the reason for it."[3] Id.

Seven years after the Florida Supreme Court issued its decision in Provenzano II, and just over two decades after Ford, the United States Supreme Court revisited the substantive standard for competency in Panetti. Panetti, a Texas prisoner sentenced to death for murdering his in-laws, claimed that his schizo-affective disorder and accompanying delusions, which "recast [his] execution as part of spiritual warfare" between "the forces of [] darkness" and "the forces of light," rendered him mentally incompetent to be executed. Panetti, 551 U.S. at 935–36, 954–56, 127 S.Ct. at 2848, 2859–60 (quotation marks omitted). Although he was aware that the State of Texas claimed that it intended to execute him because of the murders he had committed, Panetti was convinced that the stated reason was a "sham" and that the real reason the State sought his execution was "to stop him from preaching." Id. at 954–55, 127 S.Ct. at 2859 (quotation marks omitted). The Fifth Circuit affirmed the denial of federal habeas relief

---

[3] The Florida Supreme Court issued several other decisions in Provenzano's challenge to his impending execution, but those decisions did not specifically address the competency standard for execution. See Provenzano v. State, 751 So. 2d 37 (Fla. 1999) (remanding for an evidentiary hearing on Provenzano's claim of incompetency); Provenzano v. Moore, 744 So. 2d 413 (Fla. 1999) (rejecting Provenzano's challenge to Florida's method of execution).

because Panetti was aware that he would be executed and "aware that the reason the State [had] given for the execution" was the murders he had committed.  Id. at 956, 127 S.Ct. at 2860.  Under its interpretation of the competency standard articulated by Justice Powell in Ford, the Fifth Circuit concluded that Panetti's delusions were largely irrelevant to the competency inquiry because it did not matter if Panetti's mental illness prevented him from having a rational understanding of the State's reason for his execution.  Id.

The Supreme Court reversed, holding that the Fifth Circuit's approach to assessing competency was "too restrictive" and was inconsistent with Ford insofar as it treated "a prisoner's delusional belief system as irrelevant if the prisoner knows that the State has identified his crimes as the reason for his execution."  Id. at 956–59, 127 S.Ct. at 2860–61.  The Court explained that, whether Ford's competency inquiry is cast in terms of "comprehension" or "awareness" of the reasons for a prisoner's execution, Ford did not support "a strict test for competency that treats delusional beliefs as irrelevant once the prisoner is aware the State has identified the link between his crime and the punishment to be inflicted."  Id. at 959–60, 127 S.Ct. at 2861–62.  The Court concluded that "[a] prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it," and that "Ford does not foreclose inquiry into the latter."  Id. at 959, 127 S.Ct. at 2862.

41

While the Supreme Court in <u>Panetti</u> rejected an approach foreclosing an inquiry into the rationality of a petitioner's understanding, it expressly declined to "set down a rule governing all competency determinations" and it acknowledged that "a concept like rational understanding is difficult to define." <u>Id.</u> at 959–61, 127 S.Ct. at 2862. The Court stressed that "[t]he mental state requisite for competence to suffer capital punishment neither presumes nor requires a person who would be considered 'normal,' or even 'rational,' in a layperson's understanding of those terms." <u>Id.</u> at 959, 127 S.Ct. at 2862. Because of the limited record and the absence of definitive findings in that case concerning "the nature and severity of [Panetti's] alleged mental problems," the Supreme Court was hesitant to "amplify [its] conclusions or to make them more precise" and declined to apply them to that case itself. <u>Id.</u> at 961–62, 127 S.Ct. at 2863. Instead, the Court remanded the case to the district court to analyze and resolve in the first instance the issue of Panetti's competency to be executed. <u>Id.</u> at 962, 127 S.Ct. at 2863.

By way of guidance, the Supreme Court noted that "[g]ross delusions stemming from a severe mental disorder may put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose." <u>Id.</u> at 960, 127 S.Ct. at 2862. The Court also observed that "[e]xpert evidence may clarify the extent to which severe

delusions may render a subject's perception of reality so distorted that he should be deemed incompetent." Id. at 962, 127 S.Ct. at 2863. On remand, the district court found that Panetti suffered from "severe mental illness" and "paranoid delusions of some type," but that he was nonetheless competent to be executed because he possessed a rational understanding of his impending death and the "causal connection between [his crimes] and his death sentence." Panetti v. Quarterman, 2008 WL 2338498, at *36–37 (W.D. Tex. Mar. 26, 2008).

In the present case, the Florida Supreme Court did not apply the bare and narrow factual-awareness standard that the United States Supreme Court rejected in Panetti. Instead, in reviewing the state trial court's ruling against Ferguson, the Florida Supreme Court framed the question as whether there was substantial evidence to support the trial court's determination that Ferguson's paranoid schizophrenia and Prince-of-God delusion did not interfere "with his 'rational understanding' of the fact of his pending execution and the reason for it." Ferguson, No. SC12-2115, op. at 4. Citing its decision in Provenzano II and Justice Powell's concurring opinion in Ford, the court variously articulated the competency standard as whether an inmate lacks "the capacity to understand the nature of the death penalty and why it was imposed," whether he is "aware of the punishment [he is] about to receive and the reason [he is] to receive it," and whether he "understand[s] the connection between his crime and the punishment

43

he is to receive for it." Id. at 4, 8. The Florida Supreme Court concluded that, despite Ferguson's documented history of paranoid schizophrenia and genuine delusional belief that he is the Prince of God, the record nonetheless shows that he "understands what is taking place and why." Id. at 7. In particular, the Court noted that Ferguson is "aware that he has never before had a death warrant signed on his behalf and that he would be the first person to receive Florida's current protocol of medications for lethal injection," and it found sufficient evidence to support the trial court's findings that Ferguson is "aware that the State is executing him for the murders he committed and that he will physically die as a result of the execution." Id. at 7–8.

The competency standard articulated and applied by the Florida Supreme Court is not inconsistent with clearly established federal law, as set forth in Ford and Panetti. The court correctly found that Panetti did not materially alter the competency standard that it had announced in Provenzano II, which itself adopted the formulation endorsed by Justice Powell in Ford. Contrary to Ferguson's contention, the Supreme Court's decision in Panetti did not abrogate or otherwise reject the awareness standard articulated by Justice Powell, nor did it impose a new, more rigorous standard for assessing competency to be executed. Instead, the Supreme Court in Panetti generally accepted the proposition that Ford had laid down "the substantive federal baseline for competency," and it clarified that the

44

requisite "awareness" or "comprehension" required by Ford was tantamount to a "rational understanding" of the connection between a prisoner's crimes and his execution. Panetti, 551 U.S. at 935, 958–59, 127 S.Ct. at 2848, 2861–62. What the Supreme Court rejected in Panetti was an overly narrow interpretation of Ford that deems a prisoner's mental illness and delusional beliefs irrelevant to whether he can understand the fact of his pending execution and the reason for it. Id. at 959–61, 127 S.Ct. at 2861–62 (rejecting "a strict test for competency that treats delusional beliefs as irrelevant"). The Court explained that the understanding required by Ford is a rational understanding, even though it declined to define "rational" in this context. See id. at 959–62, 2862–63.

Unlike the Fifth Circuit approach rejected in Panetti, the Florida Supreme Court neither suggested that Ferguson is competent to be executed merely because he can identify the State's articulated rationale for his punishment, nor did it deem his paranoid schizophrenia and delusional belief that he is the Prince of God to be irrelevant to the issue of competency.[4] See Ferguson, No. SC12-2115, op. at 4–8.

---

[4] Read out of context, the Florida Supreme Court's statement that "[w]hether Ferguson's convictions are representative of mainstream Christian principles or delusions that derive from his mental illness does not affect our inquiry" might be interpreted as indicating that the court refused to consider Ferguson's delusions or their source. See Ferguson, No. SC12-2115, op. at 4. It is evident from the context, however, that the quoted statement was instead a decision not to adopt the state trial court's characterization of Ferguson's delusions as a manifestation of traditional Christian beliefs, albeit on a grandiose scale. As the remainder of the Florida Supreme Court's opinion makes clear, it did consider Ferguson's paranoid schizophrenia and Prince-of-God delusion as they relate to the issue of rational understanding, and it concluded that he nevertheless has a rational understanding that the reason he is going to be executed is the

45

To the contrary, the Florida Supreme Court concluded that, despite Ferguson's mental illness and delusional belief, he nonetheless "understands" the connection between his impending execution and the murders he had committed and understands that he will die when executed.  Id. at 7–8.

Although the Florida Supreme Court's decisions in Provenzano I and Provenzano II predated Panetti, they make clear that Florida's awareness standard for judging competency to be executed includes an inquiry into rationality and amounts to an awareness-plus-rational-understanding test.  See Provenzano I, 750 So. 2d at 602–03 (rejecting the argument that the Florida standard "does not allow for the rational appreciation of the connection between the crime and the punishment" and holding that Provenzano should be afforded "the opportunity to cross-examine [the State's expert witness concerning] Provenzano's rational appreciation of the connection between his crime and the punishment he is to receive") (emphasis added); Provenzano II, 760 So. 2d at 140 (citing with approval and affirming the trial court's findings that "Provenzano has a factual and rational understanding of . . . 'the fact that in accordance with the jury's recommendation, he was sentenced to death for the murder of Bailiff Arnie Wilkerson, and that he will die once he is executed'") (emphasis added).

---

murders he committed and that when executed he will die.  Just as Panetti's "severe mental illness" and "paranoid delusions" did not, in the final analysis, render him incompetent to be executed, see Panetti, 2008 WL 2338498, at *36–37, the Florida Supreme Court found that Ferguson's delusions did not render him incompetent to be executed either.

46

That the Florida Supreme Court's opinion in this case used the terms "awareness" and "understanding" interchangeably, and often used both terms without the modifier "rational," does not mean that it failed to heed the holding of Panetti or rendered a decision inconsistent with that precedent (or with its own Provenzano precedent).  We have stressed that, under § 2254(d), "we review the state court's 'decision' and not necessarily its rationale," and that "overemphasis on the language of a state court's rationale would lead to a 'grading papers' approach that is outmoded in the post-AEDPA era."  Parker v. Sec'y for Dep't of Corr., 331 F.3d 764, 785 (11th Cir. 2003) (quotation marks omitted).  Absent a "conspicuous misapplication of Supreme Court precedent . . ., we will not presume that a state court misapplied federal law" or failed to properly comprehend Supreme Court precedent.  Id. at 785–86 (quotation marks and alterations omitted).

The Supreme Court has held that some use of imprecise language does not render a state court decision inconsistent with clearly established federal law.  It does not, the Court has explained, because "readiness to attribute error" is incompatible with both "the presumption that state courts know and follow the law" and with AEDPA's "demand[] that state-court decisions be given the benefit of the doubt."  Woodford v. Visciotti, 537 U.S. 19, 23–24, 123 S.Ct. 357, 359–60 (2002).  It bears noting that, on at least one occasion, the Supreme Court in Panetti equated the requisite "rational understanding" with a certain type or degree of

47

"awareness." See 551 U.S. at 960, 127 S.Ct. at 2862 (referring to "[g]ross delusions stemming from a severe mental disorder [that] may put an awareness of a link between a crime and its punishment in a context so far removed from reality") (emphasis added). Imprecision in language is not confined to state court opinions.

The AEDPA principles of deference have special force here given the Supreme Court's recognition in Panetti that the Court itself did not know exactly what a "rational" understanding requires. The Court admitted that "a concept like rational understanding is difficult to define," id. at 959, 127 S.Ct. at 2862, and it proceeded to prove that by not even attempting a definition. The Court did say that "normal" or "rational" in this context does not mean what a layperson understands those terms to mean, id. at 959–60, 127 S.Ct. at 2862, but that only underscores the absence of a definition. And so does the Court's concession that "we find it difficult to amplify our conclusions or to make them more precise." Id. at 961, 127 S.Ct. at 2863; see also id. at 960–61, 127 S.Ct. at 2862–63 (emphasizing that it was not being more specific); id. at 978, 127 S.Ct. at 2873 (Thomas, J., dissenting) (characterizing the majority opinion's rational understanding standard as a "half-baked holding that leaves the details of the insanity standard for the District Court to work out").

Given the deference that AEDPA mandates, the "contrary to" issue is whether the standard that the Florida Supreme Court applied in determining

48

Ferguson's competency to be executed was "contrary to . . . clearly established Federal law, as determined by the Supreme Court" in <u>Panetti</u>. <u>See</u> 28 U.S.C. § 2254(d)(1).  Because the Supreme Court refrained from clearly establishing in <u>Panetti</u> any definition of rational understanding, state courts can hardly be faulted for not clearly defining it themselves.  The Supreme Court did, however, hold that whatever "rational" means in the context of competency to be executed, a court may not "treat[] delusional beliefs as irrelevant once the prisoner is aware the State has identified the link between his crime and the punishment to be inflicted." <u>Panetti</u>, 551 U.S. at 959–61, 127 S.Ct. at 2861–62.  That, and pretty much that alone, is what <u>Panetti</u> held and clearly establishes.

The standard of rational understanding that the Florida Supreme Court applied was not contrary to that holding of <u>Panetti</u>.  It did not treat Ferguson's paranoid schizophrenia and his belief that he is the Prince of God as irrelevant to whether he has a rational understanding of why he is going to be executed and of the fact that when executed he will die.  Instead, the Florida Supreme Court affirmed the trial court's finding that notwithstanding his mental condition and singular religious belief about his life after death, Ferguson has the requisite rational understanding and is competent to be executed.  <u>See</u> pp. 29–30, <u>supra</u>.  The state court decision about the applicable standard did not involve a "conspicuous misapplication of Supreme Court precedent," <u>Parker</u>, 331 F.3d at

49

785, or an "error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," Harrington, 131 S.Ct. at 786–87. For these reasons, we conclude that the rational understanding standard applied by the Florida Supreme Court to assess Ferguson's competency to be executed is not inconsistent with clearly established federal law.

## B.

Ferguson maintains that even if the Florida Supreme Court did apply the Panetti competency standard, we should nonetheless hold that it unreasonably applied that standard, either as a matter of law or as an ultimate finding of fact, by finding that that he has a rational understanding of his impending execution and the reasons for it. Although Ferguson alternatively invokes § 2254(d)(1) and (d)(2), his underlying argument is the same with respect to both AEDPA provisions.[5] We will therefore treat the issue as a single inquiry for purposes of this appeal.

Ferguson specifically contends that the state courts could not reasonably conclude that he is competent to be executed given their underlying factual

---

[5] Ferguson takes the position that, whether the Florida Supreme Court's decision is viewed under § 2254(d)(1) or (d)(2), the analysis in this case is virtually the same: whether "the underlying facts as found by the State courts" preclude a determination that he has a rational understanding of his execution. While § 2254(d)(2) specifically asks whether a state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented," Ferguson would recast the inquiry to be whether the ultimate determination of competency constitutes an unreasonable determination of fact in light of the "subsidiary findings of fact [the state] courts made." While we do not agree that the inquiries called for under § 2254(d)(1) and (d)(2) are identical, we accept Ferguson's invitation, solely for purposes of this appeal, to regard them as two different methods of analyzing the same underlying question.

findings that he suffers from paranoid schizophrenia, is not currently malingering, and harbors a genuine belief that he is the Prince of God.  Ferguson asserts that his Prince-of-God belief, which the state trial court credited as genuine, encompasses beliefs that he cannot be executed due to his "special powers," that his convictions and incarceration are really the result of both a conspiracy of corrupt policemen and the State's attempt to prevent his ascension, and that he is destined to ascend to the right hand of God and eventually return to Earth to wage war against Communism.  Ferguson argues that the state trial court's conclusion that there is "no evidence that . . . [he] believes himself unable to die or that he is being executed for any reason other than the murders he was convicted of in 1978" fails to account for that court's own finding that Dr. Woods credibly testified about the extent and gravity of Ferguson's delusions.  He contends that the state courts' underlying findings about his mental illness and delusional beliefs inevitably lead to only one conclusion:  that he does not have a rational understanding of his impending execution and the reasons for it.[6]

---

[6] Ferguson also maintains that the Florida Supreme Court unreasonably applied the procedural requirements laid down in Ford and Panetti when it concluded that he was afforded a fair hearing to determine his competency.  Ferguson, however, did not fairly present this argument to the district court in his habeas petition.  See Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1352 (11th Cir. 2009) (noting that an argument that is not fairly presented to the district court will not be considered on appeal); Hill v. Jones, 81 F.3d 1015, 1020 (11th Cir. 1996) (same).  In his 30-page counseled habeas petition, Ferguson included only two conclusory sentences asserting that he "never received [a] fair hearing" due to "incalculable due process abuses," and that the record before the district court was "severely limited by the due process abuses visited upon [him] by persons eager to rush to impose the 'ultimate penalty without the

Ferguson's contentions and arguments rest, in large part, on a misconception about the state trial court's underlying factual findings.  A close reading of the trial court's opinion reveals that it did not credit all of Dr. Woods' statements about Ferguson's delusions.  For example, the trial court did not credit Dr. Woods' statements or opinion that Ferguson believes he cannot die because he possesses "special powers" or that his convictions, incarceration, and impending execution are the result of a conspiratorial plot to prevent (or prepare, depending on whether one examines Dr. Woods' report or hearing testimony) Ferguson's post-death ascension to his rightful throne as the Prince of God.  The only part of Dr. Woods' testimony that the state trial court credited was, as the court described it, the part about "Ferguson's documented history of paranoid schizophrenia."  Ferguson, No. 04-2012-CA-507, op. at 17.  In all other respects, it credited the testimony and opinions of Drs. Myers and Werner on the question of "Ferguson's competency to be executed."  Id.  And their testimony was that Ferguson has a rational

full measure of the deliberative process.'"  In addition to the conclusory nature of these contentions, Ferguson's attorneys did not expressly designate the issue as a distinct claim for relief, nor did they specifically argue that the Florida Supreme Court unreasonably applied the procedural requirements of Ford and Panetti.

In any event, Ferguson's competency hearing did satisfy the minimum due process requirements identified in Ford and Panetti because he was given an "opportunity to submit evidence and argument from [his] counsel, including expert psychiatric evidence that may [have] differ[ed] from the State's own psychiatric examination."  See Panetti, 551 U.S. at 949–50, 127 S.Ct. at 2856 (quotation marks omitted).  Thus, even if a due process claim had been fairly presented, it would fail on the merits.

understanding of his impending execution, of the fact that he will be put to death, and of the reasons for his execution.

Moreover, the state trial court's finding that Ferguson was not malingering was limited to his not "malingering <u>during the interview with the Commission.</u>" <u>Id.</u> at 17 (emphasis added).  The court did not find that Ferguson was not malingering, or that he was telling the truth, about the alleged beliefs that he did not tell the Commission about and mentioned only to Dr. Woods.  Ferguson did not tell the Commission anything indicating that he did not think he could die or that he possesses "special powers," or that his planned execution is the result of a conspiracy among state officials instead of the penalty for the murders he committed.  Ferguson mentioned those alleged beliefs only to defense expert Dr. Woods.  And Dr. Woods did not testify at the evidentiary hearing <u>held by the state trial court</u> about any purported belief of Ferguson that his convictions and punishment are based on any alleged conspiracy.

Viewed in this light, there is no contradiction between the state trial court's findings that Ferguson believes he is the Prince of God and that he was not malingering during his appearance before the Commission, and its finding that there was "<u>no evidence</u> that in his current mental state Ferguson believes himself unable to die or that he is being executed for any reason other than the murders he was convicted of in 1978." <u>Id.</u> at 18 (emphasis added).  There was of course <u>some</u>

53

evidence, derived from Dr. Woods' report and his trial court hearing testimony, that Ferguson believes that he will not die as an immediate result of his execution and that he is being punished for reasons other than the murders he had committed. However, the trial court was not required to find that evidence credible when it was contradicted by the testimony of the State's expert witnesses.

AEDPA's command that we give state courts "the benefit of the doubt" and refrain from readily "attribut[ing] error" means, at the least, that we should avoid finding internal inconsistencies and contradictions in the decisions of state courts where they do not necessarily exist. See Woodford, 537 U.S. at 23–24, 123 S.Ct. at 359–60. While the state trial court's choice of words ("no evidence") could have been more precise and technically correct ("no credible evidence"), giving its opinion the benefit of the doubt, as we are required to do by AEDPA, it is clear to us that the trial court meant that it found no credible evidence that Ferguson genuinely believes that he will not die as a result of his execution or that his execution is unrelated to the crimes for which he was convicted. [7] The court credited the testimony of Drs. Myers and Werner that Ferguson rationally understands that he is going to die and why.

The question then, as Ferguson presents it, is whether "some fairminded jurists could agree" with the state courts' ultimate conclusion that he is competent

---

[7]There is nothing to suggest that the state trial court simply ignored facets of Dr. Woods' testimony, instead of deeming them not credible. Ferguson, No. 04-2012-CA-507, op. at 6.

to be executed given the underlying factual findings that he suffers from paranoid schizophrenia, was not malingering during the Commission's evaluation, and genuinely believes that he is the Prince of God. See Holsey, 694 F.3d at 1257. The answer is yes — fair-minded jurists could agree with that conclusion. During the Commission's evaluation, Ferguson informed the State's psychiatric experts that he had been anointed the Prince of God, that he would be resurrected at some point after his execution to sit at "the right hand of God," and that he would eventually return to Earth. Nevertheless, the State's experts, whose testimony the state trial court credited on the question of Ferguson's competency, noted that Ferguson acknowledged that he was going to be executed because of the eight murders he committed, acknowledged that he would be the first inmate to receive Florida's new lethal-injection protocol, and acknowledged that he would physically die as an immediate result of being executed. Based on those facts, as well as the absence of any outward signs that Ferguson was suffering from cognitive disturbance or impairment, Drs. Myers and Werner were of the opinion that Ferguson's delusions, even if genuine, did not prevent him from having a rational understanding of the nature of the death penalty and a rational understanding of the reasons that it was going to be imposed on him.

While Ferguson's expert, Dr. Woods, offered a contrary opinion, it was not objectively unreasonable for the state trial court to credit the expert opinions of

55

Drs. Myers and Werner, particularly in light of the undisputed evidence that Ferguson has, for over a decade, adequately functioned in his day-to-day life without the need for antipsychotic medications and without exhibiting any outward manifestations of mental illness or instability to prison officials. Moreover, two of the prison officers who appeared at the competency hearing testified that Ferguson, after pointing out that he had not had a warrant signed on his behalf in 35 years, discussed with them the disposition of his remains, without any indication that he believed that he would not physically perish. The combined testimony of all of the State's witnesses supports the conclusion that the nature and severity of Ferguson's mental illness do not render his "perception of reality so distorted" that he cannot adequately appreciate the connection between his crimes and impending execution. See Panetti, 551 U.S. at 960, 962, 127 S.Ct. at 2862–63. At the very least, a fair-minded jurist could so find, as the state trial court judge and the Florida Supreme Court did find.

This is not the first time that a court has found someone suffering from schizophrenia is mentally competent for one purpose or another. See Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1259 (11th Cir. 2002) (holding that, even under the stricter competency-to-stand-trial standard, "[t]he fact that [the petitioner] suffers from chronic schizophrenia the effects of which have come and gone over the years is not enough to create a real, substantial, and legitimate

56

doubt" about his competency); Lawrence v. Sec'y, Fla. Dep't of Corr., 700 F.3d 464, 482 (11th Cir. 2012) (affirming the district court's finding that a diagnosis of schizophrenia is not enough to show that a defendant was incompetent to enter a guilty plea or stand trial). After all, the Supreme Court in Panetti stated that the requisite mental state for competency "neither presumes nor requires a person who would be considered 'normal,' or even 'rational,' in a layperson's understanding of those terms." Panetti, 551 U.S. at 959, 127 S.Ct. at 2862.

It is also significant that the Supreme Court did not actually rule that Panetti himself was incompetent to be executed as a result of his schizo-affective disorder and accompanying delusions. Instead, it remanded the case to the district court to make a decision about that in the first instance.[8] Panetti, 551 U.S. at 956–62, 127 S.Ct. at 2860–63. As we have mentioned, on remand the district court concluded that Panetti was competent to be executed despite his "severe mental illness" and "paranoid delusions" because he nevertheless possessed a "rational understanding of the causal connection between [his crimes] and his death sentence." Panetti, 2008 WL 2338498, at *36–37.

---

[8]Even if we were to assume that the facts of this case are materially indistinguishable from those in Panetti, that would not render the Florida Supreme Court's decision inconsistent with clearly established federal law because Panetti did not reach a contrary result — the Supreme Court did not conclude that Panetti was incompetent to be executed. See Bell, 535 U.S. at 694, 122 S.Ct. at 1850 (explaining that a state court decision is inconsistent with clearly established federal law if it arrives at a different or contrary result in the face of materially indistinguishable facts).

Both the reasoning and outcome of the Supreme Court's decision in Panetti leave ample room for fair-minded jurists to conclude, as the state courts did here, that Ferguson is mentally competent to be executed despite his mental illness and the presence of a delusional belief.  See Renico, 130 S.Ct. at 1864 (explaining that, under AEDPA, "the more general the rule at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—the more leeway state courts have in reaching outcomes in case-by-case determinations) (quotation marks and alteration omitted); see also Hill v. Humphrey, 662 F.3d 1335, 1348 (11th Cir. 2011) (en banc) (concluding that the Supreme Court's decision to leave it to the states to develop specific standards for determining whether an inmate is "mentally retarded" for purposes of the Eighth Amendment "makes it wholly inappropriate for this court, by judicial fiat, to tell the States how to conduct an inquiry into a defendant's mental retardation") (quotation marks omitted).

## C.

We offer some closing thoughts about what has been consistently referred to throughout this litigation, and in this opinion, as Ferguson's delusion that he is the Prince of God and that after he dies he will be resurrected in that capacity.  The state trial court was right about this being a "grandiose" belief.  And it is not a commonplace belief or one that most people would consider normal in the colloquial sense.  As we have pointed out several times, however, the Supreme

Court stressed in Panetti that rational for purposes of competency to be executed does not mean "'normal,' or even 'rational,' in a layperson's understanding of those terms." Panetti, 551 U.S. at 959–61, 127 S.Ct. at 2862. That most people would characterize Ferguson's Prince-of-God belief, in the vernacular, as "crazy" does not mean that someone who holds that belief is not competent to be executed.

It does not mean that someone with that belief is not competent because competence to be executed is a specific inquiry into whether the petitioner has a rational understanding — in the specialized Panetti sense — of two things. One is that he is going to be executed because of the murders he committed. Ferguson's Prince-of-God delusion is not necessarily inconsistent with a rational belief that he is going to be executed because of the murders he committed.

The second part of the Panetti standard requires a rational understanding by Ferguson that he will die when he is executed. Ferguson's Prince-of-God delusion, as the state courts found it to exist (as distinguished from Dr. Woods' belief about it) does not rule out Ferguson having a rational understanding that he will die when he is executed. That much is shown by the fact that the state courts found that Ferguson, despite that delusion, knows that the execution will result in his death.

One could argue, as Ferguson's attorneys do, that his belief that he will be resurrected as the Prince of God negates a rational understanding that he will be killed and thereby establishes that he is not mentally competent to be executed.

59

That cannot be correct.  Panetti cannot mean that a belief in resurrection or other forms of life after death is inconsistent with the rational understanding of death that is required for mental competence to be executed.  If it did mean that, most Americans would be mentally incompetent to be executed.

While Ferguson's thoughts about what happens after death may seem extreme to many people, nearly every major world religion — from Christianity to Zoroastrianism — envisions some kind of continuation of life after death, often including resurrection.  Ferguson's belief in his ultimate corporeal resurrection may differ in degree, but it does not necessarily differ in kind, from the beliefs of millions of Americans.  According to a 2006 survey conducted by the AARP about views of the afterlife held by Americans over the age of fifty, 23% of respondents stated that they believed in reincarnation while an additional 50% believed in another form of life after death.  Jean Koppen & Gretchen Anderson, AARP, Thoughts on the Afterlife Among U.S. Adults 50+ 4 (June 2007), available at assets.aarp.org/rgcenter/general/afterlife.pdf (last visited April 26, 2013).  A more recent study of national surveys similarly shows that 75% of American adults believe in some form of life after death.  Andrew Singleton, Beyond Heaven? Young People and the Afterlife, 27 J. Contemp. Religion 453, 453 (2012).  Are the courts to say that three-fourths of Americans are delusional and incompetent?

Passages in the Old Testament speak of God resurrecting bones, see Ezekial 37:13–14, while resurrection and eternal life are fundamental tenets of the New Testament, see, e.g., 1 Corinthians 15:12; John 6:40; John 3:16.  Hundreds of millions of people worldwide share those beliefs.  Zoroastrian tradition teaches that, after a great struggle between God and the power of evil, there will be a general resurrection of humanity, and the resurrected will pass through molten metal to be purged of sin.  Farnaz Ma'sumian, Life After Death: A Study of the Afterlife in World Religions 24 (Oneworld Publications 1995).  The Qur'an teaches that eternal paradise awaits believers who do righteous deeds and eternal punishment awaits those who do evil deeds.  Qur'an 2:81–82.  Observers of Shinto believe that after death every person becomes a kami, a supernatural being who continues to have a part in the life of the community, nation, and family.  "Saints" in Encyclopedia Britannica Online Academic Edition, available at http://www.britannica.com/EBchecked/topic/516666/saint (last visited April 26, 2013).

Tibetan Buddhists believe that the first Dalai Lama is reborn through each successive one.  "Dalai Lama," in Encyclopedia of World Religions 275, 275 (Wendy Doniger et al. eds., Merriam-Webster 1999).  Hindu sacred texts include the story of a mortal who overcame the fear of death and became a god himself.  Christopher Moreman, Beyond the Threshold: Afterlife Beliefs and Experiences in

61

World Religions 249 (Rowman & Littlefield Publishers 2008).  Ancient Egyptians

believed that after death their pharaohs would become stars in the sky.  Id.  And

the list goes on and on.  Which of the myriad beliefs about what happens on the

other side of death are irrational, delusional, or symptoms of mental illness?

A conclusion that a particular belief about the afterlife and one's role in it is

extreme enough to be irrational, delusional, and indicative of incompetence to be

executed is only a few steps away from the same conclusion about any person who

believes in resurrection, in heaven or hell, or in any variation of life after death.

Courts should be reluctant to treat as a symptom of mental illness anyone's belief

about what will happen to him after he dies.  It is beyond the ken of courts to

measure the rationality of religious beliefs — what will happen to us after we pass

through the dark curtain of death is the ultimate non-justiciable question.

Because the state courts' determination that Ferguson possesses a rational

understanding of his execution and the reason for it is not "so lacking in

justification that there was an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement," AEDPA precludes us

from disturbing their judgment.  See Harrington, 131 S.Ct. at 786–87.

## III. CONCLUSION

AEDPA "reflects the view that habeas corpus is a guard against extreme

malfunctions in the state criminal justice systems, not a substitute for ordinary

error correction through appeal." Id. at 786 (quotation marks omitted) (emphasis added).  There was no extreme malfunction in his case.  The Florida Supreme Court properly applied Panetti's "rational understanding" standard, considered conflicting expert testimony about the nature and severity of Ferguson's mental illness, and made a determination about his competency to be executed that is by no means beyond any possibility for fair-minded disagreement.  AEDPA requires that federal habeas relief be denied and that we affirm that denial.

**AFFIRMED.**

63

WILSON, Circuit Judge, concurring in the result:

I write separately to address the Florida Supreme Court's statement that *Panetti v. Quarterman*, 551 U.S. 930, 127 S. Ct. 2842 (2007), "does not alter [its] decision in *Provenzano* [*v. State*, 760 So. 2d 137 (Fla. 2000)]." *Ferguson v. State*, Fla. 2012, __ So. 2d. __, (No. SC12-2115, Oct. 17, 2012).

Repeating the standard from *Provenzano*, the Florida Supreme Court in *Ferguson* declared that "the Eighth Amendment requires only that defendants be aware of the punishment they are about to receive and the reason they are to receive it." *Id.* (citing *Ford v. Wainwright*, 477 U.S. 399, 422 (1986) (Powell, J., concurring)); *see Provenzano*, 760 So. 2d at 140. That statement of the law is patently incorrect in the wake of *Panetti*, which explicitly held that "[a] prisoner's awareness of the State's rationale for an execution is not the same as a *rational understanding* of it." 551 U.S. at 959, 127 S. Ct. at 2862 (emphasis added).

While I acknowledge that the Florida Supreme Court was on the right track when it stated that "Ferguson [must] *understand the connection* between his crime and the punishment he is to receive for it," *Ferguson v. State*, Fla. 2012, __ So. 2d. __, (No. SC12-2115, Oct. 17, 2012) (emphasis added), its assertion that *Provenzano* remains unchanged by *Panetti* suggests that a naked awareness standard is sufficient. That is not so—once again, I emphasize that *Panetti* requires more than just a prisoner's ability to regurgitate the State's announced

64

reason for his punishment or to recite the facts attendant to his execution. *Panetti* requires "a rational understanding of the reason for [that] execution." 551 U.S. at 958, 127 S. Ct. at 2861. Therefore, insofar as the Florida Supreme Court continues to believe that "the Eighth Amendment requires only that defendants be aware of the punishment they are about to receive and the reason they are to receive it," *Ferguson v. State*, Fla. 2012, __ So. 2d. __, (No. SC12-2115, Oct. 17, 2012), it is not correct; *Panetti* requires more.

Having stated my concerns, and despite the Florida Supreme Court's acknowledgement that Ferguson is not malingering and that he suffers from mental illness, I agree that we must defer to the Florida Supreme Court's finding that "[t]here is no evidence that in his current mental state Ferguson believes himself unable to die or that he is being executed for any reason other than the murders he was convicted of in 1978." *Id.* (internal quotation marks omitted). I am therefore obliged to concur in the result.